# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUSAN SCANLON, | : | |
| Plaintiff, | : | |
| | : | No. 06-02424 |
| v. | : | |
| | : | (JUDGE SHAPIRO) |
| JEANES HOSPITAL, | : | |
| Defendant. | : | [ELECTRONICALLY FILED] |

## BRIEF IN SUPPORT OF
## DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL

STEVENS & LEE

Larry J. Rappoport
Attorney I.D. No. 26922
Theresa M. Zechman
Attorney I.D. No. 85878
620 Freedom Business Center, Suite 200
P.O. Box 62330
King of Prussia, PA 19406
(610) 205-6000

Attorneys for Defendant

Date: October 24, 2007

## Table of Contents

Page

I. INTRODUCTION.................................................................................1

II. EVIDENCE PRESENTED AT TRIAL.................................................2

    A. Evidence Related to Scanlon's Prima Facie Case of Age Discrimination .......................3

    B. Evidence Related to Scanlon's Burden to Prove By a Preponderance of the Evidence That Age Was a Determinative Factor in Her Termination. ...........................5

    C. Evidence Related to Scanlon's Attempt to Prove False Jeanes' Articulated Reasons for Her Termination.................................................................6

III. STANDARD OF REVIEW FOR POST-TRIAL MOTIONS ............................15

    A. Standard on Motion for Judgment as a Matter of Law...................................15

    B. Standard on Motion for a New Trial ...........................................................16

IV. ARGUMENT ................................................................................17

    A. The Court Should Grant Jeanes Judgment as a Matter of Law Because Plaintiff Failed to Prove at Trial a Prima Facie Case of Age Discrimination ...............................17

        1. Scanlon's Prima Facie Case Fails Because She Did Not Prove at Trial That She Was Replaced by a Sufficiently Younger Person to Create an Inference of Age Discrimination.................................................................18

        2. Scanlon's Prima Facie Case Fails Because She Did Not Prove That a Similarly Situated Sufficiently Younger Registered Nurse was Treated Better Than She. .......................................................................19

    B. The Court Should Grant Jeanes Judgment as a Matter of Law Because, On the Evidence Presented at Trial, No Reasonable Jury Could Conclude That Scanlon's Age Was a Determinative Factor in Her Termination.....................................20

        1. Scanlon Failed to Introduce Any Evidence of Age Animus.................................20

        2. Scanlon Did Not Offer Any Evidence To Prove That Jeanes' Proffered Reason Was a Mere Cover-Up For Intentional Discrimination.............................22

        3. On the Evidence Presented at Trial, The Jury Is Not Entitled to Infer Discriminatory Intent From Evidence of a Prima Facie Case and Disbelief of Jeanes' Proffered Reason.......................................................34

SL1 757642v1/027230.00005

Table of Contents
(continued)

Page

C. Jeanes is Entitled to a New Trial Pursuant to Federal Rule 59(a) ....................................38

   1. Jeanes is Entitled to a New Trial Because the Jury's Verdict is Against the
      Great Weight of the Evidence.............................................................................39

   2. The Adverse Inference, Hazen and Determinative Factor Jury Instructions
      Were Erroneous as a Matter of Law. ..................................................................40

   3. Plaintiff's Counsel's Closing Argument Included Improper Remarks,
      Referred to Evidence Not of Record and Improperly Instructed the Jury. .............53

   4. The Evidentiary Rulings Excluding Wacker's Complaint and Welsh's
      Investigation Notes Were Erroneous as a Matter of Law. .....................................62

V. CONCLUSION..............................................................................................................68

SL1 757642v1/027230.00005

## TABLE OF AUTHORITIES

### CASES

*Agere Systems, Inc. v. Atmel Corporation,*
   No. 02-CV-864, 2005 WL 2994702 (E.D. Pa. Aug. 17, 2005) .................................................16

*Alvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co.,*
   152 F.3d 17 (1st Cir. 1998), *cert. denied,* 526 U.S. 1123 (1999) ...........................................35

*Anderson v. Haverford College,*
   868 F.Supp. 741 (E.D. Pa. 1994) .............................................................................................20

*Armstrong v. Burdette Tomlin Memorial Hospital,*
   438 F.3d 240 (3d Cir. 2006)......................................................................................................41

*Austin v. Norfolk Southern Corporation,*
   No. 04-1568, 158 Fed. Appx. 374 (3d Cir. 2005)....................................................................32

*Ayoub v. Spencer,*
   550 F.2d 164 (3d Cir. 1977)................................................................................................61, 62

*Becker v. Arco Chemical Co.,*
   207 F.3d 176 (3d Cir. 2000)......................................................................................................64

*Bernhard v. Nexstar Broadcasting Group, Inc.,*
   146 Fed. Appx. 582 (3d Cir. 2005).............................................................................48, 49, 50

*Bhaya v. Westinghouse Elec. Corp.,*
   709 F.Supp. 600 (E.D. Pa. 1989), *aff'd* 922 F.2d 184 (3d Cir. 1990), *cert. denied,* 501 U.S.
   1217, 115 L.Ed.2d 997, 111 S.Ct. 2827 (1991) ......................................................................41

*Billet v. Cigna Corp.,*
   940 F.2d 812 (3d Cir. 1991), *overruled in part on other grounds by St. Mary's Honor
   Center, supra*.............................................................................................................................22

*Blanche Road Corp. v. Bensalem Township,*
   57 F.3d 253 (3d Cir. 1995).......................................................................................................54

*Brokenbaugh v. Exel Logistics North America, Inc.,*
   174 Fed. Appx. 39 (3d Cir. 2006)......................................................................................65, 66

*Buskirk v. Apollo Metals,*
   307 F.3d 160 (3d Cir. 2002)........................................................................................................2

*Citibank v. Williams,*
   190 B.R. 728 (D. R.I. 1996).......................................................................................................44

iii

*Coney v. NPR, Inc.,*
   No. 03-1324, 2007 WL 2571452 (E.D. Pa. Aug. 31, 2007) ............................................62, 63

*County of Sacramento v. Lewis,*
   523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ........................................................55

*Dexter v. Greater Cleveland Regional Transit Authority,*
   23 Fed. Appx. 371 (6th Cir. 2001) ..........................................................................................19

*Draper v. Airco, Inc.,*
   580 F.2d 91 (3d Cir. 1978) ..........................................................................................53, 54, 59

*Dunn v. HOVIC,*
   1 F.3d 1371 (3d Cir. 1993) ......................................................................................................53

*EEOC v. Metal Serv. Co.,*
   892 F.2d 341 (3d Cir. 1990) ....................................................................................................17

*Fineman v. Armstrong World Indus.,*
   980 F.2d 171 (3d Cir. 1992) ......................................................................................53, 54, 57, 60

*Forrest v. Beloit Corp.,*
   424 F.3d 344 (3d Cir. 2005) ....................................................................................................54

*Fuentes v. Perskie,*
   32 F.3d 759 (3d Cir. 1994) ....................................................................................5, 6, 22, 25, 26, 31

*Gagliardo v. Connaught-Laboratories, Inc.,*
   311 F.3d 565 (3d Cir. 2002) ....................................................................................................16

*Gatch v. Milacron, Inc.,*
   111 Fed. Appx. 785 (6th Cir. 2004) ........................................................................................19

*Glass v. Philadelphia Elec. Co.,*
   34 F.3d 188 (3d Cir. 1994) ......................................................................................................66

*Governali v. American Tempering, Inc.,*
   No. 85-7305, 1988 WL 3843 (E.D. Pa. Jan. 20, 1988) ............................................................42

*Government of the Virgin Islands v. Toto,*
   529 F.2d 278 (3d Cir. 1976) ....................................................................................................64

*Greenleaf v. Garlock, Inc.,*
   174 F.3d 352 (3d Cir. 1999) ....................................................................................................53

*Hazen Paper Company v. Biggins,*
   507 U.S. 604 ................................................................38, 45, 47, 48, 49, 59, 61

iv

*Heath v. City of Philadelphia,*
No. 95-3047, 1997 WL 560606 (E.D. Pa. Aug. 22, 1997) ......................................................60

*Herbert v. Wal-Mart Stores, Inc.,*
911 F.2d 1044 (5th Cir. 1990) .................................................................................42, 43

*Hossack v. Floor Covering Associates of Joliet, Inc.,*
492 F.3d 853 (7th Cir. 2007) .........................................................................................32

*Kautz v. Met-Pro Corporation,*
412 F.3d 463 (3d Cir. 2005).................................................................................22, 26, 30

*Keller v. Orix Credit Alliance, Inc.,*
130 F.3d 1101 (3d Cir. 1997).............................................................................................3

*Kotas v. Eastman Kodak Company,*
1997 U.S. Dist. LEXIS 13893 (E.D. Pa. Sept. 4, 1997) .........................................................39

*Larson v. CSX Transportation, Inc.,*
No. 05-214, 2007 WL 906226 (W.D. Pa. March 22, 2007) ....................................................49

*Little v. Republic Refining Co., Ltd.,*
924 F.2d 93 (5th Cir. 1991) ...........................................................................................37

*Magee v. General Motors Corp.,*
213 F.2d 899 (3d Cir. 1954).............................................................................................38

*Massey v. Blue Cross-Blue Shield of Ill.,*
226 F.3d 922 (7th Cir. 2000) .....................................................................................16, 32

*Maynard v. Marion Power Shovel,*
852 F.2d 1287 (6th Cir. 1988) ......................................................................................41

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973)......................................................................................................17

*In re MGL Corporation v. Unicom AP Chemical Corp.,*
No. 00-10804DWS, 00-10803, 2001 WL 204729 (Bankr. E.D. Pa. Feb. 5, 2001) .................44

*Millbrook v. IBP, Inc.,*
280 F.3d 1169 (7th Cir. 2002) ...................................................................................32, 33

*Montgomery Ward & Co. v. Duncan,*
311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940)........................................................40, 41

*Moussa v. Commonwealth of Pennsylvania,*
289 F.Supp.2d 639 (W.D. Pa. 2003)...........................................................................16, 39

v

*NLRB v. National Car Rental System, Inc.,*
  672 F.2d 1182 (3d Cir. 1982)..............................................................................65

*Price Waterhouse v. Hopkins,*
  490 U.S. 228 (1989)..........................................................................................17

*Reed v. Philadelphia, Bethlehem & New England Railroad Company,*
  939 F.2d 128 (3d Cir. 1991)..............................................................................62

*Reeves v. Sanderson Plumbing Products, Inc.,*
  530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).....................16, 22, 23, 24, 25, 34, 35

*Rinehimer v. Cemcolift, Inc.,*
  2001 U.S. Dist. LEXIS 111612 (E.D. Pa 2001), *aff'd,* 292 F.3d 375 (3d Cir. 2002)..64, 65, 66

*Roebuck v. Drexel University,*
  852 F.2d 715 (3d Cir. 1988)..........................................................................39, 40

*Salkin v. Temple University,*
  No. 05-6579, 2007 WL 1830562 (E.D. Pa. June 25, 2007)..............................48, 49

*Simpson v. Kay Jewelers,*
  142 F.3d 639 (3d Cir. 1998)...................................................................17, 18, 31, 38

*St. Mary's Honor Center v. Hicks,*
  509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)....................................17

*Staples v. Pepsi-Cola General Bottlers, Inc.,*
  312 F.3d 294 (7th Cir. 2002) ............................................................................24

*Stockton East Water District v. U.S.,*
  76 Fed. Cl. 497 (Ct. Fed. Cl. 2007)...................................................................44

*Teneyck v. Omni Shoreham Hotel,*
  365 F.3d 1139 (D.C. Cir. 2004)........................................................................19

*Texas Dep't of Community Affairs v. Burdine,*
  450 U.S. 248 (1981)..........................................................................................17

*Thompson v. Merck & Co., Inc.,*
  No. 05-4275, 2006 U.S. Dist. LEXIS 51481 (E.D. Pa. July 27, 2006)...................19

*United Artists Theatre Circuit, Inc. v. Township of Warrington, PA.,*
  316 F.3d 392 (3d Cir. 2003)..............................................................................55

*Valentin v. Crozer-Chester Medical Center,*
  986 F.Supp. 292 (E.D. Pa. 1997) ..........................................3, 15, 16, 21, 25, 38

*Vandenbraak v. Alfieri,*
  209 Fed.Appx. 185 (3d Cir. 2006) .......................................................................................53

*Waldorf v. Shuta,*
  896 F.2d 723 (3d Cir. 1990)...........................................................................................40, 41

*Watson v. Southeastern Pennsylvania Transp. Authority,*
  207 F.3d 207 (3d Cir. 2000)..................................................................................................36

*Williamson v. Consolidated Rail Corp.,*
  926 F.2d 1344 (3d Cir. 1991)................................................................................................38

## STATUTES, RULES & REGULATIONS

Age Discrimination in Employment Act, 29 U.S.C. §261, *et seq.* ("ADEA")................................1

Fed. R. Civ. P.50(b)(1)................................................................................................................15

Fed. R. Evid. 801(c)............................................................................................................64, 65

Fed. R. Evid. 803(6)...................................................................................................................66

Fed. R. Evid. 805 .......................................................................................................................64

Federal Rule of Civil Procedure Rule 50.......................................................................1, 15, 39

Federal Rule of Civil Procedure Rule 59...............................................................16, 38, 39, 40

SL1 757642v1/027230.00005

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SUSAN SCANLON,                    :
                    Plaintiff     :
        v.                        :     CIVIL ACTION NO. 06-02424
                                  :
                                  :
JEANES HOSPITAL                   :
a/k/a TEMPLE UNIVERSITY           :
HEALTH SYSTEM,                    :
                    Defendants    :

## DEFENDANT JEANES HOSPITAL'S BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL

Defendant Jeanes Hospital ("Jeanes"), a/k/a Temple University Health System

("TUHS"), by counsel, pursuant to Federal Rules of Civil Procedure 50(b) and 59(a), has

renewed its Motion for Judgment as a Matter of Law or, in the alternative, has moved for a New

Trial.

## I. INTRODUCTION

This is an age discrimination case, tried before a jury for four days, but missing

the critical element of whether age played any role, much less was a determinative factor, in the

challenged employment decision. The only mention of age throughout the entire trial was that

Plaintiff, who could not simply assert that she was treated poorly by Jeanes, claimed without

presenting any evidence to support such claim, that her age played a determinative role in the

decision to terminate her employment. Furthermore, Plaintiff failed to establish even a valid

*inference* of age discrimination, as there is no evidence of a *prima facie* case as a matter of law.

Plaintiff Susan Scanlon ("Plaintiff" or "Scanlon") filed the instant action against

her former employer, Jeanes, alleging that Jeanes terminated her employment in violation of the

Age Discrimination in Employment Act, 29 U.S.C. §261, *et seq.* ("ADEA"). The case was tried

1

before a jury from September 25, 2007 through September 28, 2007.[1]  The jury returned a

verdict in Plaintiff's favor on the age discrimination claim on October 1, 2007.  The jury

awarded backpay in the amount of $176,800.00 and frontpay in the amount of $40,000.00.  The

jury found in favor of Jeanes on the question of "willful" discrimination under the ADEA, and

no liquidated damages were awarded.

Respectfully, the jury's verdict cannot stand because Jeanes should have been

granted a directed verdict at the close of Plaintiff's case-in-chief and/or at the close of all

evidence, as Plaintiff failed to prove a *prima facie* case of age discrimination.  Even if Plaintiff is

found to have proven a *prima facie* case of age discrimination, the jury's verdict cannot stand

because there was insufficient evidence of intentional discrimination presented at trial to permit

the case to go to the jury and/or for the jury to return a verdict in Plaintiff's favor.  Further,

critical errors in the jury instructions and misconduct by Plaintiff's counsel at trial rendered the

trial unfair and so prejudiced Jeanes' right to a fair jury trial that a new trial is necessary.

## II.  EVIDENCE PRESENTED AT TRIAL

The following are the relevant facts presented, as they must be on a Motion for

Judgment as a Matter of Law, in the light most favorable to Scanlon and giving her the

advantage of every reasonable inference.  However, Scanlon is not entitled to the benefit of

every inference; only those inferences that may reasonably be drawn from the evidence

presented.  *Buskirk v. Apollo Metals,* 307 F.3d 160, 166 (3d Cir. 2002).  Additionally, "[t]he

question is not whether there is literally *no* evidence supporting the party against whom the

motion is directed, but whether there is evidence upon which the jury could ***properly*** find for

---

[1] While the jurors were selected on September 24, 2007, no proceedings took place that day.  Rather, opening
statements were made on September 25, 2007.

that party." *Valentin v. Crozer-Chester Medical Center,* 986 F.Supp. 292, 298 (E.D. Pa. 1997)

*(citing Walter v. Holiday Inns, Inc.,* 985 F.2d 1232, 1238 (3d Cir. 1993)) (emphasis added).

### A.  Evidence Related to Scanlon's *Prima Facie* Case of Age Discrimination

In order to prevail on her claim of age discrimination under the ADEA, Scanlon

must first prove a *prima facie* case of discriminatory discharge.  To prove a *prima facie* case

under the ADEA, Scanlon must prove by a preponderance of the evidence that (1) she was 40

years of age or over; (2) she was terminated; (3) she was qualified for the job from which she

was terminated; and (4) she was replaced by a sufficiently younger person to create an inference

of age discrimination.  *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir. 1997).

The evidence Scanlon presented in support of her *prima facie* case of age

discrimination was as follows:

Scanlon was 61 years of age at the time of her termination from Jeanes on

January 1, 2005.  (9/25/07, Trial Transcript, p. 29).[2]  She began her employment with Jeanes in

1966 as a part-time ward clerk.  (9/25/07 T.T. p. 30).  She left Jeanes between 1973 to 1975

when she located to New Jersey.  (9/25/07 T.T. p. 30).  She then returned to Jeanes in 1975 as a

part-time nurse's aide.  (9/25/07 T.T. p. 30).  Eventually she went to school to become a

Registered Nurse ("RN") and worked in that capacity for Jeanes until her termination.  (9/25/07

T.T. p. 31).  Jeanes will stipulate for the purposes of its instant Motion that Scanlon was

qualified for the position of Registered Nurse ("RN").  Accordingly, Scanlon has satisfied the

first three prongs of her *prima facie* case.

With respect to the fourth prong, which requires that Scanlon have been replaced

by a sufficiently younger employee to raise an inference of age discrimination, Scanlon claimed

---

[2] For ease of reference, Jeanes will identify the date of the trial transcript and citation to the page in question.  Jeanes has not electronically filed the 1100-page transcript.  Rather, the transcript was submitted in hard-copy to the office of the Clerk of Courts on October 10, 2007.

that she was "replaced" by Kim Coskery (age 30) and Patty Hartzell (age 48). (9/25/07 T.T.

p. 100-101; 154-55; 159; Plaintiff's Ex. 25)[3]. According to Scanlon, prior to her termination,

Coskery had never worked a day shift. (9/25/07 T.T. p. 101). However, the evidence presented

at trial demonstrated that Coskery had in fact started working on the day shift in December 2004

and had been scheduled on the day shift schedule for January 2, 2005, before any investigation

had ever been begun by Jeanes with regard to the events of January 1, 2005, the date whose

events gave rise to the investigation and subsequent decision to terminate. (9/25/07 T.T. p. 157;

9/27/07 T.T. 161-64; See Def. Ex. 30). Coskery also continued to work night shifts following

Scanlon's termination. Likewise, the evidence demonstrated that Hartzell continued to work

almost exclusively on the night shift through January 2005 after Scanlon was terminated.

(9/27/07 T.T. p. 163-64; Def. Ex. 30). Specifically, Hartzell worked 21 shifts in January 2005 of

which only two shifts were day shifts (January 7 and January 27). (Def. Ex. 30). Accordingly,

there were no facts introduced at trial that could prove a *prima facie* case as neither putative

replacement, both of whom were employed at Jeanes in the Labor & Delivery unit well before

Scanlon was terminated, really "replaced" her on the first shift for those three shifts a week or

less she worked while at Jeanes.

     Additionally, Scanlon failed to present any evidence that sufficiently younger

employees were ever treated more favorably. In fact, Scanlon's counsel claimed during a side

bar that this was not even a disparate treatment case and he was not obligated to present any

evidence of similarly situated sufficiently younger employees being treated more favorably.[4] As

---

[3] All Trial Exhibits referenced herein are contained in Appendix A which is attached hereto.
[4] For reasons unknown to Jeanes and counsel, all the sidebar conferences including the one where Plaintiff's counsel insisted, and the Court agreed at least initially, that this was not a disparate treatment case were not transcribed in the official record.

4

a result, Scanlon failed to introduce evidence that she was ever replaced by younger nurses or

that younger nurses were treated more favorably.

### B. Evidence Related to Scanlon's Burden to Prove By a Preponderance of the Evidence That Age Was a Determinative Factor in Her Termination.

At trial, Scanlon must produce evidence sufficient to prove both that Jeanes

articulated reason for her termination was false, *and that discrimination was the real reason.*

*Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994) (*citing St. Mary's Honor Center v. Hicks,*

509 U.S. 502, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993)).

Scanlon's case was devoid of any evidence that her age played any role in her

termination.  There was no evidence of any ageist comments, no evidence of others treated more

favorably, no evidence of any age-related animus and no evidence of any age bias.  In fact, when

Scanlon was asked how age played a role in her termination, Scanlon testified as follows:

> Q    Okay.  Ms. Scanlon, could you explain to the jury why you believe that age was the reason you were terminated from your employment?
>
> A    I believe age was the determining factor, because I did absolutely nothing to warrant a termination.  I have been a good employee.  I did nothing the day of 1/1/05 that they said I did.  They trumped up all of their charges.  They said I abandoned and neglected a patient.  They said I compromised her safety.  They said I refused to start an IV.  They said I refused to give Pitocin.  They said I put something in a container that I wasn't supposed to, and they also accused me of willful misconduct.
>
> Q    Okay.  Now –
>
> A    None of these things were true.

(9/25/07 T.T. p. 102)

In summary, Scanlon testified that Jeanes' reasons for her termination were

incorrect as she did absolutely nothing wrong, however, Scanlon never provided any evidence

5

whatsoever that ***discrimination was the real reason*** as required by *Fuentes*.   The very simple

fact is, Scanlon's case was devoid of any meaningful evidence from which a reasonable jury

could have concluded that her age was a ***determinative factor*** in her termination.

### C. Evidence Related to Scanlon's Attempt to Prove False Jeanes' Articulated Reasons for Her Termination.

Scanlon has failed to set forth facts proving "such weaknesses, implausibilities,

inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action

that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes v.*

*Perskie,* 32 F.3d 759, 763 (3d Cir. 1994).

On Monday, January 3, 2005, Kathleen Haviland ("Haviland") returned to work

from the holiday and found a January 1, 2005, Problem Identification Sheet completed by Susan

Wacker ("Wacker"), an OB tech who worked with Scanlon on January 1, 2005.  (Def. Ex. 3;

9/25/07 T.T. p. 195; 9/26/07 T.T. p. 169-170).  Haviland had begun her employment with Jeanes

in 1989 and in July 2004 Haviland had taken over the position of interim supervisor of the Labor

and  Delivery Unit which had been previously held by Carol Hertkorn ("Hertkorn").  (9/25/07

T.T. p. 192-93).  Haviland had no experience in the Labor and Delivery Unit nor any experience

in conducting an investigation into an employee's alleged misconduct as would be necessary in

response to the delivered Problem Identification Sheet.  (9/25/07 T.T. p. 193; 219).  She did not

solicit or encourage this complaint, it was literally left under her door step.

As explained on the Problem Identification Sheet, it is a form "to be used by the

Nursing staff to document any unusual occurrences or concerns related to patient care, staff

performance or unit operation having a direct or indirect or potential adverse effect on patient

care in the area.  This form should be completed in full and returned as soon as possible to the

Nurse Manager [Haviland]." (Def. Ex. 3).  According to the Problem Identification Sheet,

Wacker explained the following events of January 1, 2005:

> Sue Scanlon and Chris Morrell were on duty today and
> constantly bickering from the moment I came in @ 10:30.
> Sue was having a problem with her [patient].  She stated I
> think she just lost the baby in the toilet and I'm not getting
> it out that's on the doctor.  I went and retrieved long
> forceps and a formalin container for the placenta.  We went
> into the bathroom and I got the placenta, then a cord, then a
> baby.  I scooped it up out of the toilet.  At this time Jim
> Aroldi [sic] was scanning the [patient] and she started
> crying.  He and I both apolized [sic] and Sue (Scanlon) left
> the room.  I started to hug the [patient] and then I started
> crying with her.  Sue [Scanlon] was just mean and kept
> complaining about [the patient].  It was just a crazy and
> emotional day and her [Scanlon's] attitude was just
> uncalled for.
>
> Also when I pulled the baby from the toilet I put the baby
> in the formalin bucket.  I didn't know I wasn't supposed to.
> Sue [Scanlon] was standing across from me and didn't
> mention it shouldn't go in there.  Jim [Airoldi] said that it
> was 18 weeks, so we had to send it to pathology.
> Pathology couldn't accept it because the baby was put in
> the formalin.

(Def. Ex. 3).

Upon review of the Problem Identification Sheet, Haviland immediately met with

Clinical Director Elizabeth Welsh, R.N. to commence an investigation into the events of

January 1, 2005.  (9/25/07 T.T. p. 195; 9/26/07 T.T. p. 6-7).  Haviland and Welsh first met with

Wacker on January 3, 2005.  (9/26/07 T.T. p. 171-172; 176)/

Since Wacker's documentation of January 1, 2005, included two separate

concerns – (1) the bickering with Morrell; and (2)  Scanlon's treatment of a patient who

miscarried – Haviland and Welsh interviewed various individuals regarding the separate

concerns.  As to the bickering issue, Haviland and Welsh spoke with Unit Clerk Mary Geisler

("Geisler") who was present on January 1, 2005.  (9/25/07 T.T. p. 215; 9/26/07 T.T. p. 10-11;

7

152).  During their investigation of the bickering, Welsh and Haviland learned that Morrell and

Scanlon were arguing and no one wanted to be around Scanlon or Morrell.  (9/25/07 T.T. p. 215,

218).  As a result of the bickering which Welsh and Haviland found to have occurred, Welsh and

Haviland counseled both Scanlon and Morrell.  (9/25/07 T.T. p. 215).  During the January 3,

2005, meeting with Scanlon, neither Haviland nor Welsh discussed the other (and clearly more

serious) incidents of misconduct raised by Wacker.  (9/25/07 T.T. p. 219; 9/26/07 T.T. p. 9).

Contrary to the other witnesses' accounts, neither Morrell nor Scanlon believed they were

bickering on January 1, 2005.  (9/25/07 T.T. p. 212; 9/26/07 T.T. p. 8).  Since Wacker's next

claim concerning Scanlon's treatment of the patient who miscarried was still being investigated,

Scanlon was not issued any discipline concerning that issue at the time she received a verbal

counseling concerning only the complaints of bickering with Morrell.  (9/25/07 T.T. p. 219;

9/26/07 T.T. p. 9).

      As a result of Wacker's complaint regarding Scanlon's behavior and actions

toward the patient who had miscarried, Haviland and Welsh initiated an investigation into the

matter.  Haviland and Welsh spoke with Associate Hospital Director for Human Resources

Elisabeth Donahue ("Donahue") as to Wacker's claims and kept Donahue apprised of their

investigation.  (9/25/07 T.T. p. 219; 9/26/07 T.T. p. 7; 24; 84-85).  Haviland and Welsh's

investigation consisted of interviewing Wacker; Dr. Bilyak, the patient's attending physician;

and Dr. Airoldi, the physician on duty on January 1, 2005.  (9/25/07 T.T. p. 226; 229; 9/26/07

T.T. p. 23; 9/27/07 T.T. p. 5).  Haviland and Welsh met with Wacker in person on January 3,

2005, the day Haviland received Wacker's complaint.  (9/26/07 T.T. p. 10).  Haviland explained

that their goal for the investigation was to see if Wacker's complaint regarding Scanlon may

have been accurate so Haviland and Welsh chose to interview only those individuals that had

8

direct involvement in the care of the patient. (9/25/07 T.T. p. 207). As a result of the same,

Haviland and Welsh did not interview Anne Kane, the hospital nurse supervisor on duty at the

time as she was not present during the incident; Eve Parkin-Brog, the nurse who came on the

shift following Scanlon; Christine Morrell, the nurse who worked with Scanlon on January 1,

2005, Dr. Isdaner, Chairman of Jeanes' OB/GYN Department who was not present that day, the

patient or the patient's mother. (9/25/07 T.T. p. 234; 9/26/07 T.T. p. 13; 16; 19; 56; 58; 60-61;

81). Neither Welsh nor Haviland reviewed the patient's chart during the investigation because

they did not expect to find any information regarding Scanlon's behavior towards the patient

included in the chart. (9/26/07 T.T. p. 22). Haviland and Welsh interviewed Dr. Bilyak and

Dr. Airoldi by telephone on January 4, 2005 as neither was present at Jeanes on January 4, 2005.

(9/25/07 T.T. p. 206-207; 9/26/07 T.T. p. 10; 17). Welsh took notes during the interviews and

later typed the notes of her interviews with Dr. Bilyak, Wacker and Dr. Airoldi. (Def. Ex, 16,

17, and 18; 9/25/07 T.T. p. 216; 9/26/07 T.T. p. 17).

Based upon Welsh's notes regarding Haviland and Welsh's meeting with Wacker,

Wacker explained the following:

- Mrs. Scanlon called Mrs. Wacker to Room #6 about 10:45 AM

- Mrs. Scanlon stated "I think the patients [sic] placenta is in the toilet.
  I'm not getting it – it's up to the Doctor".

- Mrs. Scanlon called Dr. Jim Airoldi to have an ultrasound done.

- Mrs. Wacker went to get long forceps and a container.

- "Jim was performing the ultrasound when [Wacker] was retrieving the
  placenta from the toilet. Mrs. Scanlon was holding the container.
  [Wacker] put the placenta in the container and the cord was attached.
  [Wacker] then realized that the baby was in the toilet and [Wacker]
  scooped it out in [her] hands. As [Wacker] held the baby in [her] hands,
  Jim looked over and saw the baby. Dr. Airoldi told the patient that he
  was sorry and that [the patient] had lost her baby. [Wacker] put the

9

baby in the container and Mrs. Scanlon took the bucket and left the room."

- "Dr. Airoldi and [Wacker] stayed with the patient who was hysterical crying."

- "[Wacker] hugged the patient."

- "Dr. Airoldi left the room and [Wacker] stayed with the patient for about ten minutes. Mrs. Scanlon did not come back while [Wacker] was in there."

- "After [Wacker] left, Mrs. Scanlon returned and began asking the patient questions.  Her attitude toward the patient was snippy."

- Mrs. Scanlon was not going to do a footprint and stated "we didn't need to do it".

- "Dr. Airoldi, Mrs. Scanlon and [Wacker] checked the policy and determined that for an 18 week baby, we needy to do everything – pictures and footprint."

- "Eve [Borg] on 3-11 [shift] took the pictures."

- "The baby was wrapped up and left on the unit until the 3-11 shift arrived."

(Def. Ex. 18; 9/26/07 T.T. p. 172; 175).

Based on the review of the Problem Identification Sheet and the conversation with Wacker, Haviland believed that Scanlon failed to anticipate the needs of the patient, didn't promote teamwork amongst her peers and the physicians and failed to adhere to the core principles and service excellence standards when taking care of the patient.  (9/25/07 T.T. p. 220; Def. Ex. 27 and 28).  Haviland explained that she believed Wacker because Wacker did not have a reason to report something that did not happen and Wacker had become very emotional when she explained what happened to Haviland and Welsh making it appear to be credible.  (9/25/07 T.T. p. 220).  No one other than Wacker had complained that Scanlon had abandoned or neglected the patient.  (9/25/07 T.T. p. 224-225).  Neither Dr. Bilyak nor Dr. Airoldi advised

10

Haviland or Welsh that Scanlon had abandoned or neglected the patient, however, Drs. Bilyak

and Airoldi confirmed to Haviland that Scanlon did not provide maximal care to the patient since

Wacker's primary complaint was how Scanlon was treating the patient. (9/25/07 T.T. p. 225;

232).

  Scanlon also repeatedly mentioned to Wacker that the patient had a drug problem.

In the doorway of the patient's room, Scanlon also told Wacker that the patient probably lost her

baby from doing drugs. (9/26/07 T.T. p. 161). Wacker also witnessed Scanlon arguing with

Dr. Bilyak when Dr. Bilyak wanted to give the patient an injection of Pitocin and start an IV.

(9/26/07 T.T. p. 163). Scanlon argued with Dr. Bilyak because Scanlon did not believe that the

patient was bleeding enough to give the patient the IV and Pitocin. (9/26/07 T.T. p. 163; 165).

Wacker spent more than an hour with the patient during which Scanlon did not come into the

room. (9/27/07 T.T. p. 178).

  The next day, Haviland and Welsh interviewed Dr. Bilyak. During the interview,

Welsh took handwritten notes which she read back to Dr. Bilyak for accuracy. (9/26/07 T.T.

p. 17-18). Subsequently, Welsh typed her notes regarding the telephone interview with

Dr. Bilyak. (9/26/07 T.T. p. 17). According to Welsh's notes, Dr. Bilyak told Welsh and

Haviland the following:

> - When Dr. Bilyak was contacted, Mrs. Scanlon asked "Who is getting the
>   baby out of the toilet?  I'm not!"
>
> - Mrs. Scanlon RN was "not supportive of the patient"
>
> - When Dr. Bilyak arrived she asked for a speculum.  Mrs. Scanlon
>   informed Dr. Bilyak that there were no clean speculums available and
>   that the OB Tech would flash one for her.  This would take
>   approximately thirty (30) minutes.  After thirty minutes, Mrs. Scanlon
>   told Dr. Bilyak that it would be an additional ten minutes for the
>   speculum to cool.  At that time, the OB Tech went to the ED
>   [emergency department] and obtained a disposable speculum.

- Mrs. Scanlon showed Dr. Bilyak a large amount of clots on a blue chux stating the patient was bleeding.  Despite this knowledge, the patient did not have an IV line started.

- While patient was actively bleeding, Mrs. Scanlon informed Dr. Bilyak that she needed to go to do another admission.  Dr. Bilyak told Mrs. Scanlon "that the patient was bleeding and she could not leave her" (Dr. Bilyak).

- Mrs. Scanlon, an experienced [Labor and Delivery] RN, "did not anticipate the needs of the patient or physician and required constant physician direction".

- Mrs. Scanlon "did not anticipate the need for IV Pitocin".  Dr. Bilyak had to request that Mrs. Scanlon get the Pitocin.

- Dr. Bilyak stated that Mrs. Scanlon "seemed spaced out" and "had to be told what to do every step of the way".  "I felt like she (Mrs. Scanlon) was not there."

- Dr. Bilyak was concerned that the baby as well as the placenta and cord were put in Formalin.  As a result of this action, chromosomal studies could not be performed.

- Dr. Bilyak stated that Mrs. Scanlon "was not ignorant but just didn't seem to know what to do".  "She's a nice person".

(Def. Ex. 17).

Dr. Bilyak also explained that Scanlon kept leaving the room.  Dr. Bilyak had to call Scanlon to return to the patient's room to assist and that Scanlon was difficult to work with because she felt she had to ask Scanlon to do every little thing that day.  (9/25/07 T.T. p. 226-27; 9/27/07 T.T. p. 18; 46-47).  Based on the conversation with Dr. Bilyak, Welsh believed that Scanlon had failed to start an IV even though the patient had passed a lot of blood clots.  (9/26/07 T.T. p. 22-23).

SL1 757642v1/027230.00005

Likewise, Welsh also took notes during their January 4, 2005, telephone conversation with Dr. Airoldi. (9/27/07 T.T. p. 86). Based on Welsh's notes, Dr. Airoldi told Welsh and Haviland the following:

> - Mrs. Scanlon "was in a bitchy mood on 1/1/05. This was evident by "her bitching and moaning at the Nurses Station".
>
> - Mrs. Scanlon "seemed to be very frustrated with this patient and the amount of care that the patient needed".
>
> - Mrs. Scanlon felt that the "patient's demands were demeaning, such as getting ice or water".
>
> - Mrs. Scanlon felt that "the patient was very needed and had been calling out for help all night".
>
> - Dr. Airoldi thought that Mrs. Scanlon had been with the patient "all night".

(Def. Ex. 16; 9/27/07 T.T. p. 84-86).

Dr. Airoldi testified that he believed Welsh had contacted him following the events of January 1, 2005 to get his perspective as to what happened that day and she wanted to know what "all the bitching and moaning [was] about." (9/27/07 T.T. p. 95). Based on Dr. Airoldi's comments, Haviland believed that Scanlon had been bitchy and that Scanlon was not being a 'team player.' (9/25/07 T.T. p. 229).

On January 5, 2005, Welsh was scheduled to undergo foot surgery. (9/26/07 T.T. p. 9). As a result, Welsh was not able to meet with Scanlon to hear Scanlon's side of the story so Denise Frasca ("Frasca"), Associate Hospital Director for Patient Services and Chief Nursing Officer, who Welsh reported to and who was responsible for any decision involving the discipline of nurses, assumed responsibility for the investigation from Welsh. (9/26/07 T.T. p. 9; 9/26/07 T.T. p. 38; 42). Frasca and Haviland were scheduled to met with Scanlon to hear

Scanlon's side of the story on January 5.  (9/26/07 T.T. p. 42).  Welsh would have conducted the

meeting if she had not undergone foot surgery on that same day.  (9/26/07 T.T. p. 45).

In preparation for her meeting, Frasca reviewed the documents provided by

Haviland and Welsh regarding their telephone conversations with Dr. Bilyak and Dr. Airoldi and

their meeting with Wacker.  Frasca also discussed the issues with Welsh and Haviland.  (9/26/07

T.T. p. 42).  In advance of Frasca's meeting with Scanlon, Welsh had prepared and given to

Frasca a Corrective Action Report dated January 5, 2005.  (9/25/07 T.T. p. 208; 9/26/07 T.T.

p. 9; 45).  In that Report, the suggested discipline was Scanlon's discharge.  Welsh provided this

report to Frasca in case Frasca decided to use it.  No final decision to terminate Scanlon had been

made prior to January 5, 2005 since Haviland and Welsh wanted to give Scanlon an opportunity

to explain her actions.  (9/25/07 T.T. p. 208-209; 9/26/07 T.T. p. 10).  If Scanlon was able to

provide Frasca with an explanation for Scanlon's actions and behavior of January 1, Frasca

would have discarded the document.  (9/25/07 T.T. p. 211; 9/26/07 T.T. p. 10).  It was entirely

Frasca's decision as to whether Scanlon's employment would be terminated.  (9/25/07 T.T.

p. 211; 9/26/07 T.T. p. 10).

On January 5, 2005, Frasca and Haviland met with Scanlon.  (9/26/07 T.T. p. 46).

During the meeting, Scanlon did not agree that she had done anything wrong.  (9/26/07 T.T.

p. 46).  Scanlon explained to Haviland and Frasca that she had been disturbed and upset when

she came on duty because the C-section rooms had not been set up from the previous shift since

there was no tech on the night shift.  (9/26/07 T.T. p. 47).  However, Frasca questioned Scanlon

whether, as an experienced OB nurse, Scanlon had the ability to set up the rooms.  (9/26/07 T.T.

p. 47-48).  Scanlon told Frasca that she knew how to set up the rooms and it would have taken

her only five minutes to do so.  (9/26/07 T.T. p. 48).  In response, Frasca asked Scanlon why she

14

did not set up the rooms if it would have only taken her five minutes to do it. (9/26/07 T.T. p. 48). Scanlon responded it was not her job to set up the rooms. (9/26/07 T.T. p. 48). Scanlon also complained that she was upset that she had more patients than the other nurse on duty that day, Christine Morrell ("Morrell"). (9/26/07 T.T. p. 48). Yet, Frasca noted that Scanlon never requested any help from Morrell or others which could have been arranged if she had needed assistance. (9/26/07 T.T. p. 48-49). If Scanlon needed assistance because she felt she had too many patients, Scanlon was required to ask Morrell to assist her in taking care of her other patient so Scanlon could prioritize the care of the patient. (9/26/07 T.T. p. 48-49; 53). Yet, Scanlon had left the patient alone in the room to take care of a new patient. (9/26/07 T.T. p. 49).

Based upon the investigation and Scanlon's response to the same, Frasca believed that Scanlon had violated Jeanes' customer service standards, the respect service and quality values and "just the standards of what an OB nurse should have known and done in the same, other nurses would have done in the same scenario." (9/26/07 T.T. p. 50). As a result, Frasca provided Scanlon the termination notice. (9/26/07 T.T. p. 50).

## III. STANDARD OF REVIEW FOR POST-TRIAL MOTIONS

### A. Standard on Motion for Judgment as a Matter of Law

Upon renewed motion for judgment as a matter of law, the Federal Rules of Civil Procedure permit the court to: "(A) allow the judgment to stand, (B) order a new trial, or (C) direct entry of judgment as a matter of law." Fed. R. Civ. P.50(b)(1).

"'The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find for that party.'" *Valentin v. Crozer-Chester Medical Center,* 986 F.Supp. 292, 298 (E.D. Pa. 1997) (*quoting Walter v. Holiday Inns, Inc.,* 985 F.2d 1232, 1238 (3d Cir. 1993) (*quoting Patzig v. O'Neil,* 577 F.2d 841, 846 (3d Cir. 1978))). A Rule 50 motion should be

15

granted if, after viewing the evidence in the light most favorable to the non-movant, there is

insufficient evidence from which a jury could reasonably find liability. *Gagliardo v. Connaught-*

*Laboratories, Inc.,* 311 F.3d 565, 568 (3d Cir. 2002).

  The standard of review is the same as when a court reviews a motion for summary

judgment, except that the court now has the benefit of knowing exactly what evidence was

presented at trial. *Massey v. Blue Cross-Blue Shield of Ill.,* 226 F.3d 922, 924 (7th Cir. 2000);

*See also Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147

L.Ed.2d 105 (2000).  The inquiry is not to second-guess the jury's view of the contested

evidence, but to determine whether, given the totality of the evidence, Scanlon presented the jury

with legally sufficient evidence from which it could conclude in her favor.  "In conducting its

review of the evidence, a court may not make credibility determinations, weigh the evidence, or

develop its own version of the facts, as these functions are within the province of the jury and not

the judge." *Agere Systems, Inc. v. Atmel Corporation,* No. 02-CV-864, 2005 WL 2994702 (E.D.

Pa. Aug. 17, 2005) (*citing Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120

S.Ct. 2097, 147 L.Ed.2d 105 (2000); *see also Lightning Lube Inc. v. Witco Corp.,* 4 F.3d 1153,

1166 (3d Cir. 1993)).

**B.  Standard on Motion for a New Trial**

  Rule 59(a) permits a party to seek relief from a judgment by filing a motion for a

new trial.  Specifically, this relief may be sought on various grounds, including that the verdict

was against the weight of the evidence or that the district court made substantial errors in the

admission or rejection of evidence or in its instructions to the jury. *Moussa v. Commonwealth of*

*Pennsylvania,* 289 F.Supp.2d 639 (W.D. Pa. 2003) (*citing Montgomery Ward & Co. v. Duncan,*

311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147 (1940).  "A court analyzing a motion for a new

trial need not view the evidence in the light most favorable to the verdict winner." *Valentin v.*

16

*Crozer-Chester Medical Center,* 986 F.Supp. 292, 298-99 (E.D. Pa. 1997) *(citing Magee v. General Motors Corp.,* 213 F.2d 899, 900 (3d Cir. 1954)).

## IV. ARGUMENT

### A. The Court Should Grant Jeanes Judgment as a Matter of Law Because Plaintiff Failed to Prove at Trial a *Prima Facie* Case of Age Discrimination

To state a disparate treatment in employment claim under the ADEA, a plaintiff must demonstrate that she was "singled out and treated less favorably than others similarly situated on the basis of age." *EEOC v. Metal Serv. Co.,* 892 F.2d 341, 347 (3d Cir. 1990). The plaintiff may present either direct evidence of discriminatory intent or indirect evidence of discrimination. *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989) ("mixed motives" cases); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) (pretext cases). As Scanlon was unable to produce any such direct evidence, the analysis of Scanlon's claim is governed by the burden shifting paradigm of *McDonnell Douglas* and its progeny. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507 (1993); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248 (1981); *Simpson v. Kay Jewelers,* 142 F.3d 639, 643-44 (3d Cir. 1998). The plaintiff in an ADEA case must prove by a preponderance of the evidence that age played a role in the employer's decision making process and that age had a determinative effect on the outcome of that process. *Simpson v. Kay Jewelers, supra,* at 644-45.

As Scanlon did not offer any direct evidence of age discrimination, she was required to present evidence under the burden shifting analysis used in indirect evidence cases. Pursuant to this burden shifting framework, Scanlon must first establish a *prima facie* case.

To establish a *prima facie* case under the ADEA and/or PHRA, Scanlon must establish that:

> (1) she was a member of a protected class (i.e. she was forty years of age or older);

17

(2)     she was qualified for the position at issue;

(3)     she suffered an adverse employment decision; and

(4)     was replaced by a sufficiently younger person to create an
        inference of age discrimination.

*Simpson v. Kay Jewelers,* 142 F.3d 639, 644 n. 5 (3d Cir. 1998).

Scanlon failed to satisfy the fourth prong of her *prima facie* burden because there

was no evidence that she was ever replaced by someone outside the protected class.

> **1. Scanlon's *Prima Facie* Case Fails Because She Did Not Prove at Trial That
>    She Was Replaced by a Sufficiently Younger Person to Create an Inference
>    of Age Discrimination.**

Scanlon's age discrimination claim fails as a matter of law because she failed to

prove the fourth prong of the required *prima facie* case: that she was replaced by someone

sufficiently younger to create an inference of age discrimination.

In the instant case, Scanlon claimed that the weight of the evidence disclosed that

Scanlon was replaced by Coskery and/or Hartzell. Scanlon testified that prior to her termination

Coskery never worked on day shift. Scanlon claimed that the first time Coskery began working

day shift was after Scanlon's discharge on January 5, 2005. As a result, Scanlon claimed that

Coskery "replaced" her. Scanlon also claimed that Hartzell was moved to day shift to replace

her. However, the evidence in the form of the schedule of nurses in Labor and Delivery

presented to the jury clearly established the contrary. The staffing schedules for December 2004

and January 2005 established that Coskery had in fact started working day shifts the month prior

to Scanlon's discharge and had been scheduled to work and worked a day shift on January 2,

2005 before Haviland had even learned of the January 1, 2005 events . Additionally, these

schedules also established that Hartzell continued to work primarily evening shifts throughout

18

January 2005.  Accordingly, there is no evidence that Scanlon was in fact replaced by Coskery and/or Hartzell.[5]

It is within the power of this Court to grant judgment as a matter of law upon a finding that Scanlon did not prove a *prima facie* case of age discrimination.  *Teneyck v. Omni Shoreham Hotel,* 365 F.3d 1139 (D.C. Cir. 2004) (granting judgment as a matter of law to defendant on plaintiff's failure-to-hire age discrimination claim because plaintiff failed to establish a *prima facie* case); *Gatch v. Milacron, Inc.,* 111 Fed. Appx. 785 (6th Cir. 2004) (reversing district court's denial of employer's post-jury verdict renewed motion for judgment as a matter of law on plaintiff's age discrimination claim because plaintiff failed to prove a *prima facie* case of age discrimination); *Dexter v. Greater Cleveland Regional Transit Authority,* 23 Fed. Appx. 371 (6th Cir. 2001) (affirming district court's decision to grant motion for judgment as a matter of law because plaintiff failed to prove *prima facie* case of age discrimination).

### 2. Scanlon's *Prima Facie* Case Fails Because She Did Not Prove That a Similarly Situated Sufficiently Younger Registered Nurse was Treated Better Than She.

Likewise, Scanlon failed to produce any evidence that Jeanes treated any non-protected similarly situated persons who were charged with the same or similar acts more favorably.  "[E]mployees are similarly situated only if they 'engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"  *Thompson v. Merck & Co., Inc.,* No. 05-4275, 2006 U.S. Dist. LEXIS 51481, *8 (E.D. Pa. July 27, 2006) (*citing Anderson v. Haverford College,*

---

[5] In his closing argument, counsel argued in the absence of evidence to support the theory that perhaps Jeanes was essentially "extorted" by these two younger nurses to find them day shift jobs or risk losing them.  (9/28/07 T.T. p. 53-54).  Not only did the evidence not support such a claim but it was pointed out during Jeanes' closing argument that neither Coskery nor Hartzell were ever called to testify to support this convoluted theory and that an adverse inference should not be drawn especially in light of the many other Jeanes' employees who were called by Scanlon to testify.  Yet, the Court for reasons described within suggested that the adverse inference cuts against Jeanes who could not be expected to anticipate this argument that runs completely counter to the evidence.

868 F.Supp. 741, 745 (E.D. Pa. 1994) (*quoting Mitchell v. Toledo Hospital,* 964 F.2d 577, 583 (6th Cir. 1992))). Thus, to be "similarly situated," Scanlon had to show "the other employee's acts were of 'comparable seriousness' to [her] own infraction." *Anderson,* 868 F.Supp. 741, 745 (E.D. Pa. 1994) (*quoting Linear v. Safeway Grocery,* 843 F.2d 298, 301 (8th Cir. 1988)).

Scanlon failed to present any evidence of any comparators since Scanlon, through counsel, mistakenly claimed that this was not a disparate treatment case and she did not need to present evidence of the same. Rather, Scanlon attempts only to play to the sympathy of the jury that she was an experienced nurse without a prior record of discipline and confusing arguably unfair treatment with age discrimination. She was not terminated based on her record but rather on the events of a single day. However, under the ADEA there are only two types of claims, disparate treatment and disparate impact. As this case clearly does not involve disparate impact, it is necessarily a disparate treatment claim. Scanlon's failure to present any such evidence is fatal to her *prima facie* case.

**B. The Court Should Grant Jeanes Judgment as a Matter of Law Because, On the Evidence Presented at Trial, No Reasonable Jury Could Conclude That Scanlon's Age Was a Determinative Factor in Her Termination.**

**1. Scanlon Failed to Introduce Any Evidence of Age Animus**

While the Court's consideration of the evidence can, and should, stop with a finding that as a matter of law Scanlon failed to establish a *prima facie* case of age discrimination, if this Court finds that Scanlon established a *prima facie* case, the evidence at trial was insufficient as a matter of law to overcome Jeanes' legitimate nondiscriminatory reasons for Scanlon's discharge. Scanlon did not meet her burden of providing sufficient evidence that Jeanes stated reasons for terminating her employment was pretextual and that the "real reason" for her discharge was her age.

SL1 757642v1/027230.00005

In order to meet this burden, Scanlon must have submitted sufficient evidence to permit the jury to conclude that the termination was age motivated or that Jeanes' reasons for her discharge were entirely unworthy of any credence.

Scanlon failed to identify any age animus or even any age related comments. In *Valentin v. Crozer-Chester Medical Center,* 986 F.Supp. 292 (E.D. Pa. 1997), the jury found for the plaintiff on her claim of national origin discrimination. The only evidence of discriminatory animus "involved stray remarks by supervisors and co-workers." *Valentin,* 986 F.Supp. at 301. In particular, Valentin's supervisor stated "it's a shame we can't hire them all white" and that she was not going to contact an applicant because "she might have been Filipino." *Valentin,* 986 F.Supp. at 301. The court determined that these alleged statements were stray and not related to the decision to terminate. The court then stated "[t]he only evidence Valentin offered related to her national origin involved stray remarks by supervisors and co-workers." *Valentin,* 986 F.Supp. at 301. The court found that because such evidence could not support a finding of national origin discrimination without making this critical link between the termination decision and any evidence of discriminatory animus, the court was required to overturn a jury verdict in the plaintiff's favor and to instead enter judgment as a matter of law in favor of the defendant.

Here, there is no evidence any age animus, let alone any evidence that could be construed as age-related. Therefore, there is no evidence of age discrimination and the evidence on record was insufficient as a matter of law to prove that Jeanes' legitimate nondiscriminatory reasons for Scanlon's termination were pretextual, or dishonest.

**2. Scanlon Did Not Offer Any Evidence To Prove That Jeanes' Proffered Reason Was a Mere Cover-Up For Intentional Discrimination**

**a. Standard for Proving Pretext**

Scanlon bears the burden of either discrediting Jeanes' proffered reason or adducing evidence that discrimination was more likely than not a motivating or determinative cause of the employment action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *Billet v. Cigna Corp.*, 940 F.2d 812, 825 (3d Cir. 1991), *overruled in part on other grounds by St. Mary's Honor Center, supra.* Additionally, the Third Circuit has explained:

> [i]n *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Court held that proof of pretext does not have to include evidence of discrimination, but rather "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." 530 U.S. at 147, 120 S.Ct. 2097. Although *Reeves* makes clear that we may not require affirmative evidence of discrimination in addition to proof of pretext, it does not change our standard for proving pretext which "places a difficult burden on the plaintiff." *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir. 1994).

*Kautz,* 412 F.3d at 467.

"Whether judgment as a matter of law is appropriate in any particular case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 148-49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The real question in this case is whether Scanlon has produced sufficient evidence for a rational jury to conclude that she was discriminated against and discharged not unfairly or as a result of an investigation that may have been flawed, but because of her age. The Supreme Court set the parameters for sufficiency of the evidence in its decision

22

in *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 148-49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

   Under the *Reeves* standard and considering the totality of the circumstances, Scanlon has not introduced sufficient evidence of intentional discrimination. The quantum of proof adduced by Scanlon is even less than that presented by the plaintiff in *Reeves* wherein the plaintiff established both a prima facie case and pretext. It is uncontroverted in the record that Scanlon was terminated because the decision-makers accepted Wacker's version of the events of January 1, 2005. There is no direct evidence to establish that this explanation was pretext and unworthy of belief. While the jury may have disagreed with Jeanes' treatment of a long-standing nurse or questioned the way the investigation was handled, it could not properly conclude that Wacker did not report an incident on January 1, 2005 which the decision-makers accepted as being credible even if the jury may not have. Even if Wacker had her own agenda in raising the issue of Scanlon's treatment of this patient, perhaps out of a concern to protect herself for complicity in the way the fetus was improperly handled preventing chromosomal studies that Dr. Bilyak wanted, that is not a pretext for age discrimination. Wacker's motivation is of no consequence unless it related to Scanlon's age.

   In disputing the decision made following the investigation, the most Scanlon could establish was to point out that Hertkorn would have handled the investigation differently; that the doctors did not conclude Scanlon had committed misconduct; that the investigation was not thorough; and that she had never received any prior written discipline. Scanlon claims that a jury could have determined that Jeanes' reason for her termination was pretextual because, prior to her termination, her performance had been considered satisfactory. This argument is both factually and legally infirm. Adequate performance by Scanlon at some point in the past does

not negate Jeanes' decision that her performance during January 1, 2005 left much to be desired and failed to meet their standards of excellence.  It is an employee's performance at the time of her termination that is critical to determining whether that termination was discriminatory. *Staples v. Pepsi-Cola General Bottlers, Inc.,* 312 F.3d 294 (7th Cir. 2002).

Furthermore, "[i]t is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097.  Accordingly, as the *Reeves* Court explained, the existence of the prima facie case, coupled with evidence of pretext, is not always enough to satisfy the plaintiff's burden of proving intentional discrimination. *Reeves,* 530 U.S. at 146-47, 120 S.Ct. 2097.  Specifically, the Court stated:

> This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.  **For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.** *See Aka v. Washington Hospital Center,* 156 F.3d, at 1291-92; *see also Fisher v. Vassar College,* 114 F.3d at 1338 ("[I]f the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent").  **To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50, and we have reiterated that trial courts not "'treat discrimination differently from other ultimate questions of fact.'"** *St. Mary's Honor Center,* 509 U.S. 502, 524, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (*quoting Aikens,* 460 U.S. at 716, 103 S.Ct. 1478).

24

*Reeves,* 530 U.S. at 148 (emphasis added).

In *Reeves,* the employer presented a legitimate reason for the plaintiff's termination, the falsification of time records. However, the Court found that the jury could infer age discrimination because of other evidence presented which included: (1) numerous derogatory, age-related comments made to the plaintiff by plaintiff's supervisor; (2) plaintiff's supervisor had treated younger employees more favorably; and (3) the decision-maker was married to plaintiff's supervisor. Clearly, this type of pretext evidence is totally absent from this case.

Here, at most, Scanlon created only a weak issue of fact as to whether Jeanes' reason was untrue. There was no evidence of any age animus comments, no evidence that younger employees were treated more favorably, no evidence of mistreatment or inconsistent treatment of other older nurses and no evidence that the decision-makers did not hold the sincere, even if perhaps mistaken, belief in Wacker's complaint. Scanlon has failed to establish pretext.

In order to prove pretext, the evidence presented must prove "both that the reason was false, ***and that discrimination was the real reason.***" *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994) (*citing St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 2752, 125 L.Ed. 2d 407 (1993)). As a result, Scanlon at all times bears the ultimate burden of persuasion that Jeanes' proffered reason "is merely a fabricated justification for discriminatory conduct." *Valentin,* 986 F.Supp. at 300. Accordingly, to prove that Jeanes' stated reason is pretextual and a cover-up for illegal discrimination, Scanlon must prove "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions ... that a reasonable fact-finder could rationally find them 'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Fuentes,* 32 F.3d at 755 (citations omitted).

25

In *Kautz v. Met-Pro Corporation*, 412 F.3d 463 (3d Cir. 2005), the Court of Appeals explained that "*Fuentes* instructs that pretext is not shown by evidence that 'the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" *Kautz*, 412 F.3d at 467 (*citing Fuentes*, 32 F.3d at 765). Applying *Fuentes*, the *Kautz* Court explained that plaintiffs must present evidence which contradicts "core facts put forward by the employer as the legitimate reason for its decision." *Kautz*, 412 F.3d at 467 (*citing Stanziale*, 200 F.3d at 106 (upholding summary judgment where the plaintiff attempted to show pretext by disputing the importance of the difference in educational qualifications between himself and the person hired rather than challenging the disparity itself or proving that the qualifications at issue bore no actual relationship to the employment being sought); *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1110 (3d Cir. 1997) (en banc) (determining that summary judgment was appropriate despite plaintiff's contention that his failure to meet or approach his goal of raising $1.5 billion in financing was due to factors beyond his control, stating that "the relevant question is not whether Keller could have done better; instead, the relevant question is whether the evidence shows that it was so clear that Keller could not have done better that ORIX Credit Alliance could not have believed otherwise")). It is what Jeanes believed happened, not what happened, that is determinative. Only by showing that Jeanes' belief was a pretext for age discrimination can Plaintiff prevail.

Scanlon has not produced any evidence to establish that Jeanes' decision to terminate her employment was pretextual. Haviland certainly received a complaint from Wacker about Scanlon. Haviland and Welsh certainly discussed the events of January 1, 2005 with Wacker, Bilyak and Airoldi. Due perhaps in part to how emotional Wacker was when she

26

explained her concerns, Welsh and Haviland accepted Wacker's account. Also, according to

Welsh, Bilyak and Airoldi supported at least certain portions of Wacker's version of the events

that Scanlon was "bitchy" and repeatedly left the room. As a result, of their investigation, Welsh

planned for the possibility that Scanlon's employment would be terminated but left the ultimate

decision up to Frasca. Frasca met with Scanlon on January 5 to discuss the complaint. Scanlon

simply denied that anything occurred and testified that she was given short shrift by Frasca who

had already made up her mind. If that were the case, it is clear that Frasca did not know who

Scanlon was. (9/26/07 T.T. p. 46). This further demonstrates that age played no role in the

decision to terminate, let alone a determinative factor. Frasca chose not to believe Scanlon. As a

result, Frasca terminated Scanlon's employment. Based on their conversations with Wacker,

Bilyak and Airoldi, Welsh and Haviland had reached the same conclusion that Scanlon had been

inappropriate with the patient and was not compassionate in violation of the excellence standards

and core principals. While Bilyak and Airoldi may have softened their positions regarding

Scanlon's conduct on the day in question or even provided inconsistent testimony, there is no

change to the fact that Welsh and Haviland believed Wacker that Scanlon had committed

misconduct. There is simply no evidence that Haviland, Welsh and/or Frasca ever disbelieved

Wacker, Bilyak or Airoldi or seized upon the opportunity presented by Wacker's complaint to

rid themselves of an older nurse and, for that reason, because she was an older nurse.

   Scanlon also takes issue with the fact she requested to review the patient's chart

and that she was allegedly not provided the opportunity to have a fair treatment hearing. The

ADEA does not impose any such legal obligation that requires an employer who is discharging

an employee to provide that employee with any legal right to review documentation or to refute

the reasons for the termination. Scanlon had no right to the chart and Jeanes' decision not to

27

grant Scanlon access to the chart, while it may be reviewed as unnecessary or even inappropriate, cannot be viewed as being because of Scanlon's age.  Likewise, the evidence established that Scanlon failed to follow the time limits outlined in the Fair Treatment Policy.  There was no evidence presented that Scanlon asked Jeanes to waive and/or extend the time limitations in which to respond under the Fair Treatment Policy.  Again, while this decision may have been myopic or perhaps overly officious that goes to the fairness, not to the falsity. The ADEA protects employees against age discrimination but does not protect against unfair treatment; they are not one and the same  Also, there was no evidence presented that Jeanes' Fair Treatment Policy was applied in a discriminatory manner towards Scanlon where younger employees received the benefit of waived time limits while Scanlon was held to a stricter more "by the books" standard.

Here, Scanlon asks the jury to sit as a super-personnel department and perform a "do over" about whether the investigation was thorough and conducted properly and whether they would have given her a second and better chance.  Scanlon argued that the investigation was neither complete nor thorough and repeatedly asked the jury to evaluate the thoroughness and competency of Jeanes' investigation.  To further prove her point, Scanlon called Hertkorn to testify that as Scanlon's previous manager, Hertkorn would have conducted the investigation differently.  Such information is irrelevant to the determination as to whether Jeanes was motivated by age animus in terminating Scanlon.  Further, Scanlon never presented any evidence which questioned the good faith assessment of the allegations that were brought to Jeanes' attention by Wacker and investigated by Welsh and Haviland.  Frasca believed Scanlon had violated the Hospital's customer service, standards of performance and its core principles in terms of Scanlon's care of that patient.  Jeanes had every right to credit one version of the events

28

over the other and to decide based on the same that Scanlon was not the kind of nurse it wished to continue to employ. That she was age protected at this time does not make this decision age motivated.

Furthermore, Scanlon took issue with the extent of the investigation because Scanlon believed that others should have been interviewed by Haviland and Welsh. However, again such information is irrelevant and mere hindsight. Haviland and Welsh conducted the investigation as they believed it needed to be conducted, whether artfully or inartfully. They interviewed the person who lodged the complaint – Wacker – as well as the physicians involved with the patient and who were present in Room 6 on that day - Drs. Bilyak and Airoldi. The responses suggested that something had happened on the morning of January 1, 2005 and it was "wrong." The fact that they did not interview Morrell or Brog who came on the following shift would not have answered Haviland and Welsh's questions about what happened as they weren't there at the time. Haviland and Welsh interviewed only those who they believed could best describe what happened that day in the patient's room. Jeanes' failure to interview additional witnesses that Scanlon would like to have been interviewed does not demonstrate any discrimination based upon her age.

Likewise, Scanlon also claimed that because neither the patient nor her mother ever complained about her conduct, Jeanes should not have taken any action against her. This argument is meritless and the fact that Jeanes did not receive a complaint from the patient and/or solicit the same from the patient does not establish pretext. There is no need for a patient to lodge a complaint before Jeanes is required to take any disciplinary action against a nurse. Also, to solicit such information from the patient is likewise inappropriate and not necessary before Jeanes can issue any disciplinary action against a nurse. This patient lost her baby on January 1,

29

2005.  There is no need or requirement for this patient to re-live the events of that day.  Jeanes' failure to wait for a complaint to be lodged by the patient and/or interview the patient does not demonstrate age animus.

Haviland, Welsh and Frasca made the best decision they could with the information they had at that time.  In fact, the entire incident would have never have been noticed had it not been for Wacker's complaint which could not and rightfully was not ignored. Jeanes did not have to be correct with regard to terminating Scanlon and Scanlon cannot prove pretext by merely submitting evidence that Jeanes was incorrect in its belief.  She must prove not just a mistake but that the reasons are false and there clearly is a large difference between the two.  There is simply no cover up or evidence of pretext. In analyzing pretext, courts are not to do an independent assessment of how they might have evaluated and treated an employee as the court's task is not to assess the overall fairness of Jeanes' decision to terminate Scanlon or the competency of its investigation or the investigators.  As previously noted, courts "will not second guess the method an employer uses to evaluate its employees." *Kautz*, 412 F.3d at 468.  The question is not whether Jeanes made the best or even a sound business decision; the question is whether the real reason Scanlon was terminated was based upon her age.  There is simply no evidence that Scanlon was terminated because of her age or that Jeanes engaged in any "cover-up."

Scanlon has not presented any evidence that would allow a reasonable fact-finder to infer that discrimination was more likely than not a motivating or determinative cause of her termination.  Such evidence could have included demonstrating that the employer in the past had subjected her to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of her protected class more favorably, or that the employer has similarly

30

discriminated against other members of the protected class. *Fuentes*, 32 F.3d at 765. "'To show

that discrimination was more likely than not a cause for the employer's action, the plaintiff must

point to evidence with sufficient probative force that a factfinder could conclude by a

preponderance of the evidence that [the impermissible factor] was a motivating or determinative

factor in the employment decision.' *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d

639, 644-45 (3d Cir. 1998). Scanlon failed to present any such evidence that would rebut

Jeanes' reasons for terminating her.

### b. Scanlon Did Not Introduce Appropriate Pretext Evidence

Scanlon failed to introduce any evidence from which a rational jury could

conclude that Frasca was ever, at the time Scanlon was terminated, shown evidence or otherwise

made aware of any information that would have caused Frasca to disbelieve Wacker, Bilyak or

Airoldi. Scanlon cannot establish pretext simply by *now* challenging the validity, rather than the

genuineness, of Frasca, Welsh and Haviland's beliefs that Scanlon had committed misconduct.

Had Scanlon introduced evidence that Frasca, Welsh and/or Haviland were advised by Bilyak

and Airoldi and/or Wacker that Scanlon had done a great job on January 1, 2005 and rejected

that evidence accepting instead only damning evidence, or had Scanlon introduced evidence that

these decision makers were clear that Bilyak, Airoldi and/or Wacker were not telling the truth,

then there could conceivably be evidence that the decision makers ignored "the truth" and

*manufactured* their concerns as a pretext for discrimination. However, Scanlon did not present

any evidence that any of the individuals involved with the investigation disbelieved Wacker,

Bilyak and/or Airoldi based on the information that was provided to them on January 3-4, 2005.

Scanlon failed to present any evidence that rebutted or was contrary as to what

Frasca, Welsh and/or Haviland *knew* or legitimately *believed* at the time of Scanlon was

terminated. This is because Scanlon's own beliefs as to the truth, or even the objective truth,

cannot establish pretext as a matter of law without evidence that the decision-makers ***deliberately ignored*** the truth in favor of discriminatory animus. "[A] plaintiff cannot get to a 'jury if [her] only 'evidence' had been that defendants' witnesses were not worthy of belief. That would have made it a no-evidence case, and such a case a plaintiff must lose, because [she] has the burden of proof.'" *Millbrook v. IBP, Inc.,* 280 F.3d 1169, 1181 (7th Cir. 2002) (*citing Equal Employment Opportunity Commission v. G-K-G, Inc.,* 39 F.3d 740, 746 (7th Cir. 1994)). "Rather, 'to avoid a directed verdict or a JNOV, a plaintiff must do more than merely argue that the jury might have chosen to disbelieve all of the defendant's evidence. . . . A plaintiff must offer substantial evidence to support the argument.'" *Millbrook,* 280 F.3d at 1181 (*citing Fischbach v. District of Columbia Department of Corrections,* 86 F.3d 1180, 1183 (D.C. Cir. 1996)); *See also, Austin v. Norfolk Southern Corporation,* No. 04-1568, 158 Fed. Appx. 374 (3d Cir. 2005) (reversed district court's denial of employers' motions for judgment as a matter of law as a reasonable jury could not have found employer failed to take corrective action or that plaintiff established pretext); *Hossack v. Floor Covering Associates of Joliet, Inc.,* 492 F.3d 853 (7th Cir. 2007) (affirming district court's granting of employer's motion for judgment as a matter of law because jury's finding that employer discharged employee because of sex was not supported by sufficient evidence); *Massey v. Blue Cross-Blue Shield of Illinois,* 226 F.3d 922 (7th Cir. 2000) (affirming district court's granting of employer's motion for judgment as a matter of law after verdict for plaintiff since the question is not whether the supervisor was being too picky about plaintiff's writing style; it was whether the supervisor genuinely believed that plaintiff was not producing the kind of work the employer wanted.).

       Scanlon's only defense was that Wacker and all of the decision-makers misjudged what occurred. Other than Scanlon's own self-serving statement, there is simply no evidence

that Haviland, Welsh and/or Frasca lied or engaged in some conspiracy to cover-up. Rather, the uncontradicted testimony of Haviland, Welsh and Frasca established that based upon the discussions with Wacker, Bilyak and Airoldi, they believed that Scanlon committed misconduct which included the fact Scanlon refused to ask for assistance when she needed it, repeatedly left the patient's room, demonstrated a complete lack of compassion towards the patient and failed to provide proper customer service.

None of the evidence Scanlon presented of pretext supports a reasonable inference that Jeanes lied or "made it all up" when it explained its rationale for discharging Scanlon. For argument purposes only, the most the evidence presented established was that Haviland, Welsh and Frasca may have been mistaken or perhaps wrong or quick to judgment about the events of January 1, 2005 and/or that their decision to discharge was harsh; however, there was no evidence that Haviland, Welsh and/or Frasca engaged in any cover-up or deceit all in the pursuit of discharging Scanlon because of her age. While Scanlon believes that the jury should be allowed to question how thorough the investigation was to decide whether or not Jeanes lied, without any evidence calling into question Jeanes' veracity, what this case really comes down to is the jury deciding whether Jeanes conducted a thorough enough investigation and/or whether their decision to terminate was just too harsh. "But believing or not believing the decisionmaker is simply saying that the employer made the wrong choice – which is not illegal." *Millbrook,* 280 F.3d at 1183. Because there is no evidence of pretext, Scanlon failed to create an inference that Jeanes intentionally discriminated against her when it terminated her employment.

Here, assuming Scanlon presented evidence of pretext, at best she "created only a weak issue of fact as to whether the employer's reason was untrue." *Id.* There is absolutely no evidence of intentional discrimination – not one ageist comment, nor any harassment. Scanlon

has no proof that Jeanes terminated her employment because of her age. The case presented is simply not enough under *Reeves* to sustain a jury verdict in her favor, even if, as Scanlon claims, some evidence of pretext had existed.

Termination decisions are difficult and sometimes require employers to side with one employee's version of events over the other employee's, but those decisions are for the employer to make – not the court and not the jury – unless there is evidence of illegal discrimination. In this case, Scanlon presented absolutely no evidence of age discrimination, and while she attempted to rely on an inference of discrimination by challenging Jeanes' investigation and whether she had a full opportunity to defend herself at a fair treatment hearing, she failed to present any evidence calling into question the veracity of Jeanes' belief as to what happened on January 1, 2005. There was no evidence that the decision-makers' beliefs, at the time the decision to discharge was made, did not sincerely believe that Scanlon had engaged in misconduct on January 1, 2005.

### 3. On the Evidence Presented at Trial, The Jury Is Not Entitled to Infer Discriminatory Intent From Evidence of a *Prima Facie* Case and Disbelief of Jeanes' Proffered Reason

Scanlon will undoubtedly argue that the jury was entitled, even in the absence of any evidence of discriminatory intent, to infer that Scanlon's age was a determinative factor in her termination if it simply disbelieved Jeanes' proffered reasons for Scanlon's termination. However, contrary to Scanlon's anticipated argument, it is not always the case that a jury may find intentional discrimination solely because it does not believe the employer's stated reason for a challenged employment decision. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("This is not to say that [proof that the defendant's explanation is unworthy of credence] will always be adequate to sustain a jury's finding of liability"). "Certainly there will be instances where, although the plaintiff has established a

34

*prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no

rational factfinder could conclude that the action was discriminatory." *Reeves,* 530 U.S. at 148.

Judgment as a matter of law is appropriate where a plaintiff produces only

evidence that the defendant's proffered reason is false (rather than actual evidence of

discriminatory intent).  Courts review "the strength of the plaintiff's prima facie case, the

probative value of the proof that the employer's explanation is false, and any other evidence that

supports the employer's case and that properly may be considered on a motion for judgment as a

matter of law." *Reeves,* 530 U.S. 148-149.  As a result, if the plaintiff has a weak prima facie

case, a jury is not entitled to infer discriminatory intent solely from evidence of pin-pricks in the

defendant's proffered reason. *Alvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co.,* 152

F.3d 17, 25-26 (1st Cir. 1998) (granting judgment as a matter of law to defendant on plaintiff's

age discrimination claim and stating "[t]he fact that Pepsi's proffered explanation was not

entirely consistent does not give a jury license to disbelieve all of the uncontradicted evidence

indicating that Alvarez was discharged as a result of the fight" and "where both the *prima facie*

case and the showing of pretext are weak, and there is no independent evidence that would

reasonably allow the inference that age discrimination was the motivation for Pepsi's actions,"

the jury is not permitted to infer discrimination from a showing of pretext), *cert. denied,* 526

U.S. 1123 (1999)).

Here, Scanlon's *prima facie* case is extremely weak (if indeed it exists at all) and

her evidence of pretext consists entirely of her claim that the Jeanes' decision-makers and

Wacker, Airoldi and Bilyak are all liars (without any reasonable link to age animus), the jury is

not entitled to simply infer without actual evidence of discriminatory intent that Scanlon's age

was a determinative factor in her termination.

35

Scanlon failed to produce any evidence that age was the real reason she was discharged. Rather, Scanlon argued that she always performed her job properly including that day and that the investigation by Jeanes was not thorough because neither Haviland, Welsh nor Frasca: (1) interviewed Christine Morrell; (2) interviewed Eve Parkin-Brog; (3) interviewed the night shift nurses; (4) interviewed Dr. Isdaner; (5) interviewed Anne Kane; (6) interviewed the patient; (7) interviewed the patient's mother; and (8) reviewed the patient's chart.

Even if taken all of Scanlon's claims as true that the investigation was not thorough; that Wacker's assessment of the events was wrong; that Airoldi and Bilyak were wrong or inconsistent about how Scanlon treated the patient; and that the results of Jeanes investigation were flat out wrong, there was still no evidence of age discrimination presented to the jury. Rather, as a last ditch effort for a motive for the termination, Plaintiff's counsel improperly ties the termination decision to some imagined cost cutting measure even though **no** such information was ever presented to the jury and even though had the decision been a cost cutting measure, the same would not violate the ADEA, as outlined more thoroughly below. Employers are permitted to be wrong and not violate the ADEA. Accordingly, in *Watson v. Southeastern Pennsylvania Transp. Authority*, 207 F.3d 207 (3d Cir. 2000), the Court explained that employment discrimination laws "permit an employer to take an adverse employment action for a reason that is not 'true' in the sense that it is not objectively correct. For example, if an employer sincerely believes that an employee has stolen company funds and discharges the employee for this reason, the employer should not be held liable under the statutes in question just because it turns out that the employee did not steal the funds and that the employer's reason for the discharge was in this sense not 'true.'" *Watson*, 207 F.3d at 222. Here, Jeanes sincerely believed Scanlon engaged in misconduct and treated a patient poorly on January 1, 2005 and

36

discharged Scanlon because of that belief. Jeanes should not be held liable under the ADEA if, assuming Scanlon's claims that she did nothing wrong are true, Jeanes' reason for the discharge was in this sense not "true."

"The existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification." *Little v. Republic Refining Co., Ltd.,* 924 F.2d 93, 97 (5th Cir. 1991) (*citing Bienkowski v. American Airlines, Inc.,* 851 F.2d 1503, 1507 (5th Cir. 1988)). Thus, even if Scanlon was factually correct about her own job performance, the fact that Jeanes at one time believed that statements given by Wacker, Bilyak and Airoldi were true and worthy of belief is strong evidence that Frasca, Haviland and Welsh were motivated by them. "[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason. We do not try in court the validity of good faith belief as to an employee's competence. Motive is the issue." *Little,* 924 F.2d at 97 (*citing De Anda v. St. Joseph Hosp.,* 671 F.2d 850, 854 n. 6 (5th Cir. 1982)). Scanlon failed to present any evidence of motive except as is set forth below, a motive that is entirely inconsistent with the law; i.e. to save money by "replacement costs."

Additionally, even if this Court finds that Coskery and/or Hartzell are found to be Scanlon's replacement, Scanlon's reliance upon this fact provides an insufficient basis to support the jury's verdict. "This fact was properly considered in establishing [Scanlon]'s prima facie case, but it is clearly insufficient for [Scanlon]'s ultimate burden of proving intentional age discrimination." *Little,* 924 F.2d at 97 (*citing Elliott v. Group Medical & Surgical Servs.,* 714 F.2d 556, 562 (5th Cir. 1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984)).