IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SUSAN SCANLON                          :        CIVIL ACTION
                                       :
        v.                             :
                                       :
JEANES HOSPITAL, a/k/a TEMPLE          :
UNIVERSITY HEALTH SYSTEM               :        NO.  06-2424


MEMORANDUM AND ORDER

NORMA L. SHAPIRO, S.J.                                        January 23, 2008

        A jury found by a preponderance of the evidence that Jeanes Hospital ("Jeanes" or the

"Hospital") terminated Susan Scanlon because of her age but had not willfully discriminated in

violation of the Age Discrimination and Employment Act, 29 U.S.C. § 261, *et seq*. (the

"ADEA").  It awarded Ms. Scanlon back pay in the amount of $176,800.00 and front pay in the

amount of $40,000.00[1] but no liquidated damages were awarded.

        Jeanes Hospital, moving for judgment as a matter of law or for a new trial, argues that: 1)

Scanlon failed to make out a *prima facie* case of age discrimination; 2) no reasonable jury could

have concluded that Scanlon's age was a determinative factor in her termination; and 3) Jeanes is

entitled to a new trial.  It also argues for a new trial because: (a) the jury's verdict is against the

great weight of the evidence; (b) jury instructions were erroneous; (c) plaintiff's counsel's

closing arguments were improper; and (d) the exclusion of certain documents from evidence was

erroneous.  Because the jury could have reasonably found that Scanlon was terminated because

---

[1] By agreement of the parties following the jury verdict, the court also decided if she was entitled to damages for pain and suffering; the court awarded $40,000.00.  The total verdict was $273,366.92 including prejudgment interest.

of her age and the court committed no errors of law, defendant's motion for a judgment as a matter of law or a new trial will be denied.

I.       **BACKGROUND**

For the twenty-year period preceding January 1, 2005, plaintiff Susan Scanlon was employed as a registered nurse at Jeanes. She was also employed by Jeanes in other capacities before completing her nursing degree; her total time of employment at Jeanes was approximately thirty-seven years. At the time of her termination, Scanlon was sixty-one years old.

On January 1, 2005, a patient under Scanlon's care suffered a miscarriage. Following the miscarriage, Scanlon's OB-tech[2] submitted a formal written complaint alleging that Scanlon had mistreated the patient. In alleged response to this complaint, Jeanes terminated plaintiff's employment for gross misconduct.

Scanlon's termination occurred early on January 5, 2005. Shortly after arriving at work, Scanlon was presented with a termination notice. The notice provided few factual details surrounding the alleged events of January 1, 2005, but did state that Scanlon had not adhered to the Hospital's Standards of Practice, Customer Service Expectations or Service Excellence Standards. The nurse manager allowed Scanlon to respond to the allegations, but dismissed her explanation of the events as insufficient to warrant continued employment.

---

[2]An OB-tech is essentially a nurse's assistant and is responsible for various nurse-support functions in the maternity ward.

2

II.      **TESTIMONY AT TRIAL**

1.      **Susan Scanlon's Testimony**[3]

Scanlon began working for Jeanes in 1966; she worked in various capacities and began

working as labor and delivery nurse in 1985.  In late 1988 she began working the day shift, and at

the time she was terminated she was working three twelve-hour day shifts per week in the labor

and delivery unit.

On January 1, 2005 she handled either three or four patients; the other nurse on duty

handled one.  The house doctor that day was Dr. James Airoldi.  The house doctor is typically

asleep at the hospital and is only disturbed if a patient needs attention.  Scanlon awoke Dr.

Airoldi at 8:00 a.m. that morning to assess the patient in Room 2, then awoke him at

approximately 10:00 a.m. to admit a patient to Room 1.  She awoke Dr. Airoldi again at

approximately 10:30 a.m. because the patient in Room 6, who would miscarry later  that

morning, was vomiting.  Dr. Airoldi did not assess the patient; he instructed Scanlon to

administer Vistaril.[4]  After she administered the Vistaril, Scanlon returned to another patient in

active labor and dilated three to four centimeters.

Shortly thereafter, Scanlon was summoned back to Room 6 by the other nurse on duty.

The patient in Room 6 was sitting on the toilet; Scanlon assisted the patient into bed but noticed

blood clots in the toilet.  Scanlon again called Dr. Airoldi, who came to assess the patient.  She

also asked for assistance from her OB tech, Sue Wacker.

Scanlon instructed Wacker not to flush the toilet because she did not want to lose the

---

[3] Because the jury verdict was for Scanlon, the court treats the facts she alleges as true.

[4] Vistaril is an anti-nausea medication.

3

contents and asked Wacker to get a container and forceps.  Scanlon and Wacker together

retrieved the placenta and fetus from the toilet and placed it in a Formalin[5] bucket.  Meanwhile,

Dr. Airoldi determined there was no fetus in the womb.

Scanlon took the container to an empty room and placed the contents on a blue hospital

sheet.  After examining the contents, she informed Dr. Airoldi that the fetus was intact and all

parts had been expelled.  Dr. Airoldi stayed with patient for about fifteen minutes; he did not

order Scanlon to administer Pitocin or start an IV.  The patient was not bleeding much following

the miscarriage.

The patient's personal physician was Dr. Bilyak.  She arrived at the hospital after the

miscarriage.  Dr. Bilyak examined patient and instructed Scanlon to start an IV for antibiotics

and Pitocin.  She and Dr. Airoldi had a conversation in the hall regarding the gestational age of

the fetus, to determine postmortem procedure.  They decided the fetus was eighteen weeks old.[6]

Scanlon weighed, measured, took footprints and tagged the fetus.  After the patient's mother

arrived, Scanlon offered her and the patient some tea and discussed with them what to do with

the fetus.

Scanlon testified the only thing in normal hospital procedure for a miscarriage that she

failed to do was photograph the fetus.  She continued to care for the miscarriage patient until her

shift ended at 3:00 PM that day.  During this time, Scanlon also continued to care for a patient in

active labor in Room 1.  At end of her shift, Scanlon gave a report to the nurses working next

---

[5] Formalin is a trade name for formaldehyde.

[6]  The miscarriage procedure for fetuses older than sixteen weeks is the same as that for a
normal death; there is typically an undertaker, a burial, and a death certificate.  Fetuses under
sixteen weeks are handled differently.

shift.

The nurse supervisor that day was Anne Kane; Scanlon contacted Kane at beginning of her shift to inform her that the labor and delivery unit was short one nurse and that no OB tech had worked night shift.  She also told her that Susan Wacker, the OB tech, was not scheduled to work until 11:00 a.m. and that the operating room was dirty from a 3:00 a.m. procedure.  At 10:30 a.m., Kane visited the labor and delivery unit and Scanlon informed her of the miscarriage.

The next day Scanlon was scheduled to work was January 3.  Near the end of her shift, Scanlon was called to meet Ms. Welsh, Jeanes' Clinical Director of Nursing, and Ms. Haviland, the Interim Nurse Supervisor.  During this meeting Scanlon was disciplined for allegedly bickering with another nurse on duty during her shift on January 1.  Neither Welsh nor Haviland questioned Scanlon about allegations of misconduct regarding the miscarriage at that meeting.

Scanlon's next scheduled shift was January 5.  When she arrived at work, she was summoned by Haviland to Frasca's office.  Frasca was Jeanes' Chief Nursing Officer.   Scanlon had no idea why she was being summoned.   Frasca accused Scanlon of not being compassionate with the miscarriage patient.  Scanlon testified that Frasca then threw a termination notice in front of her.  Scanlon read the termination notice, but it did not say specifically what she had done wrong.  When Scanlon asked what she had done wrong, Frasca said it was all in the notice. The notice, which was admitted into evidence, read:

> On Saturday, January 1, 2005, a fetal demise occurred in the Labor and Delivery Unit.  Mrs. Scanlon was the RN caring for the patient.  The patient expelled an 18 week stillborn and placenta in the toilet while vomiting.  Mrs. Scanlon's action did not adhere to the expected Standards of Practice.  This is considered negligent by our hospital and other professional standards.  Patient safety was compromised [sic]. Furthermore, Mrs. Scanlon's behaviors were inconsistent with our

5

> Customer Service Expectations, our Service Excellence Standards as
> well as the TUHS Core Principle's [sic] which are required of all
> employees.  Her actions clearly disregarded the needs and best interest
> of the patient and were inconsistent with our expectations.

Scanlon asked to see the patient's chart.  Frasca said she did not have it and asked Scanlon to sign the termination notice.  Scanlon refused; she was escorted to her locker to collect her things, then to the Human Resources office where Scanlon was given an employee appeal form, called a Fair Treatment Hearing form.  Scanlon completed the form.

On January 25, 2005 Scanlon returned to Jeanes to sign her termination notice because she had been informed that unless she signed she would receive no paperwork for accrued compensation or benefits.   Scanlon was then informed for the first time that her right to a fair hearing had expired.  This was the first time Scanlon heard of any limitation on her time to apply for a Fair Treatment Hearing.

Scanlon testified that she believed that age was the determinative factor in her termination and the charges for which the hospital terminated her had been "trumped up" and none of them were true.

## 2.    Kathleen Haviland's Testimony

Haviland was the Interim Supervisor of Labor and Delivery in January 2005.  Her duties included supervision of the Labor and Delivery Unit.  She did not work on the day of Scanlon's alleged misconduct.

Haviland participated in the investigations of both Scanlon's alleged bickering on January 1, 2005 and her alleged mistreatment of the patient.  No statements were taken from any nurses to corroborate that Scanlon had been bickering on January 1.  Haviland claimed she had relied on

written statements from Dr. Airoldi and Dr. Bilyak; however, on examination Haviland admitted

that the doctor's statements on which she claimed to rely were recorded on January 4; the

disciplinary meeting for Scanlon was held on January 3 and the only issue discussed was

bickering.

Haviland participated in the investigation of Scanlon's alleged misconduct, but did not

interview Scanlon.  She did not interview Anne Kane, Scanlon's house supervisor that day.

Haviland testified that the decision to terminate Scanlon had already been made prior to the

January 5 meeting unless Scanlon could offer a legitimate justification for her conduct.  The

termination notice was prepared in advance of the meeting.  It did not indicate specific things

done wrong by Scanlon.  Haviland could not recall what specific information, if any, they had

shown Scanlon at the meeting despite Scanlon asking for the chart.  She did not personally

inform Scanlon of her right to a Fair Treatment Hearing.

Elizabeth Donahue, Chief of Human Resources, supervised Haviland's investigation.

Haviland testified that she did not know if an employee accused of misconduct should be

questioned during management's investigation of the allegations.  No one other than Wacker

complained that Scanlon had not performed her duties that day; neither physician said that

Scanlon had abandoned or neglected the patient.

When asked whether Wacker's complaint was the sole basis for her termination,

Haviland testified that doctors had remarked that Scanlon did not provide optimal care.  When

asked which doctors, Haviland testified at first that she could not remember, then said she

remembered Dr. Bilyak saying it.  Haviland then stated that Scanlon was not a team participant,

but admitted that Scanlon had three or four patients on January 1, while the only other nurse on

7

duty had one.  Haviland also testified that Scanlon was accused of violating hospital policy by placing the fetus in a Formalin bucket, but then testified that there was no hospital policy on what to do with a miscarried fetus and admitted Scanlon did not violate a Hospital policy by putting it in a bucket.  Prior to January 1, 2005 Scanlon had never been subject to discipline.  Haviland testified that Dr. Airoldi complained of Scanlon being "bitchy" on January 1, 2005.

In December 2004, there were two nurses who wanted to move to the day shift; a Ms. Hartzell and Ms. Coskery, both younger than Scanlon.  Ms. Coskery was thirty years old at the time of Scanlon's termination.  Three day shifts per week opened when Scanlon was terminated.

Haviland's apparent lack of command of the facts and the contradictions in her testimony made her appear incredible.

### 3.  Elizabeth Welsh's Testimony

Welsh was the Clinical Director of Nursing at Jeanes at the time of Scanlon's termination.  On January 3, 2005 Haviland informed Welsh of the allegations of bickering and Sue Wacker's allegations of misconduct.   Elizabeth Donahue, Chief of Human Resources, directed Welsh and Haviland to investigate whether Scanlon had violated hospital policies in her care of the miscarriage patient.

Welsh testified that on January 3, 2005 she interviewed Scanlon with Haviland regarding the bickering.  She was aware of the allegations of misconduct at that time, but she did not question Scanlon about them.

She presented the findings of her interviews regarding the miscarriage to Frasca on January 4, 2005.  In the course of her investigation, Welsh had spoken only to Wacker, Dr. Airoldi and Dr. Bilyak.  A component of the alleged allegations against Scanlon was that she did

not fully complete the work required for processing a miscarriage.  Welsh did not interview the nurse whose shift followed Scanlon's to determine if this were true and she did not review the patient's chart; she did not expect to find anything in the chart that would aid her investigation. Jeanes never received a complaint from the miscarriage patient about her care.

Welsh also testified that Labor and Delivery was not short one nurse on January 1.  After plaintiff's counsel presented Welsh with the staffing schedule that day, with one of the three nurses scheduled for that day crossed out (when she called out sick), Welsh maintained that the unit was not short a nurse and that two nurses were normally assigned to that unit.

When asked what specifically Scanlon had done to warrant her termination, Welsh accused Scanlon of not starting an IV for a patient suffering from heavy bleeding; she contended that a nurse can start an IV without a doctor's order.  Welsh testified that Dr. Bilyak told her that the patient had not had an IV started despite bleeding.

Welsh admitted that nurses on the night shift in December 2004 wanted to move to day shift, including one named Kim Coskery.  When Scanlon was fired, it created an opening in the day shift for Kim Coskery.

Welsh testified that age played no role with regard to decision to fire Scanlon.  She did not give Scanlon a second chance because she was appalled by Scanlon's behavior and said that Scanlon could have saved her job if she had talked about problems with co-workers, given reasons for attending to other patients, or called the nursing supervisor.  When asked if she had an opportunity to do those things at the January 5 meeting, Welsh responded that Scanlon could have done so on January 1.  Welsh did not give Scanlon an opportunity to explain herself before she typed up a termination notice and gave it to Frasca.

With regard to the bickering charge discussed at the January 3, 2005 meeting, both nurses denied that they bickered.  Welsh claimed they were nonetheless disciplined because Dr. Airoldi told her they bickered.  On cross examination it was clear that Welsh did not speak to Dr. Airoldi until January 4, but the discipline meeting was on January 3.  Prior to January 3, Welsh had only spoken to the unit clerk about charges of bickering.

Welsh's testimony was evasive and persistent even when contradicted by other evidence; it also conflicted with testimony offered by other witnesses.

### 4.	Denise Frasca's Testimony

Frasca was the Chief Nursing Officer at the time of Scanlon's termination.  She decided to terminate Scanlon based on the investigation conducted by Haviland and Welsh; she did not participate in the investigation except to present the termination notice to Scanlon, which she did not prepare.  Frasca testified that had Welsh been working, she would have terminated Scanlon rather than Frasca.

Frasca termed Scanlon's conduct "egregious" and testified that the following were the reasons for Scanlon's termination: (1) failing to start an IV for a patient who suffered a miscarriage; (2) failing to administer Pitocin; (3) compromising patient safety; (4) failing to start an IV for a patient that was bleeding heavily; (4) failing to anticipate a doctor's needs; (5) abandoning a patient; and (6) failing to comfort a patient who suffered a miscarriage.

Frasca conceded that the termination notice said nothing about an IV or the fetus, but insisted that Scanlon made a mistake by placing the fetus in a Formalin bucket.  However, when pressed by plaintiff's counsel, Frasca admitted that hospital policy does not state what to do with a fetus after a demise; it directs only that a placenta should be sent to the lab.  She did not look at

10

the patient's chart prior to firing Scanlon, and conceded that there had been no complaint from the patient about her care.

Frasca testified that Scanlon did not file a grievance opposing the reasons for her termination, but admitted Scanlon denied doing anything wrong at the January 5 meeting.  When presented with Scanlon's Fair Treatment Application, Frasca agreed that the form was signed and dated January 5, 2007.  Frasca testified that no one ever informed her Scanlon had filed a request for a Fair Treatment Hearing.

In the autumn of 2004, Jeanes decided to increase the number of nurses at Jeanes because of an increase in the volume of maternity patients.  Frasca testified that they began such staffing increases during the fall and hired with no view toward the age of the nurses.  When cross examined as to this testimony, it became clear that the only new nurse hired for the maternity ward during the Fall of 2004, Kim Coskery, was 30 years old.

### 5.    Dr. Neil Isdaner's Testimony

Dr. Isdaner was chairman of Jeanes' OB/GYN department at the time of Scanlon's termination.  Dr. Isdaner never observed Scanlon neglect a patient, received no complaints from any patients about personality or care given by Scanlon, and had never been contacted about Scanlon for discipline purposes.

The first he heard of Scanlon's termination was from Scanlon herself, and Dr. Isdaner volunteered to speak on her behalf.  He wrote two letters to the administration to keep her on staff because he thought she was a good nurse.

Dr. Isdaner testified that the hospital had no policy on what do to with a miscarried fetus under twenty-four weeks as of January 1, 2005.  Notably, and in conflict with the testimony of

11

the hospital administration officials, Dr. Isdaner testified that a nurse cannot administer an IV

unless she deems it medically necessary when a physician doesn't respond in a timely fashion.

He further testified that a nurse cannot administer Pitocin without a doctor's order unless it is an

emergency and the patient is bleeding; if it is not an emergency and the patient is suffering only

mild bleeding, a nurse should not administer Pitocin absent a doctor's order.

Dr. Isdaner testified that the nurse administrators gave him the impression that Scanlon

was too slow to perform her job well.

### 6.     Elizabeth Donahue's Testimony

Donahue was Chief of Human Resources at Jeanes in January 2005.  She coordinated

Welsh and Haviland in their investigation of Wacker's complaint about the plaintiff and she

supervised Frasca in her decision to terminate Scanlon.  She personally reviewed Scanlon's file

to determine whether she should be fired.  Donahue also supervised Jeanes Hospital's opposition

to Scanlon's unemployment compensation application.

Donahue testified that Jeanes hospital is self-insured with regard to unemployment

compensation so it has an interest in opposing applications for payment; if an employee is

terminated for gross misconduct, Jeanes' policy is to oppose payment of unemployment

compensation.  Scanlon had earned a substantial amount of personal and holiday time at the time

of her dismissal[7].  Jeanes did not compensate Scanlon for that time because she was terminated

for gross misconduct, according to hospital policy.

Donahue confirmed that no one spoke to Scanlon regarding the allegedly mishandled

miscarriage prior to January 5, 2005.

--------

[7] Counsel stipulated that the figure totaled $7,973.

12

### 7.      Anne Kane's Testimony

Kane was the Coordinating Nurse Supervisor at the time of Scanlon's termination.  Kane testified that as nurse supervisor, she is the contact for employees that are having problems with other employees.  Susan Wacker did not contact her on January 1, 2005 with a complaint about Scanlon.

Kane testified that the January 1, 2005 shift was short one nurse.  She had never seen Scanlon abandon a patient and considered Scanlon a hard worker.

### 8.      Carol Hertkorn's Testimony

Hertkorn was the Maternal Child Health Department Manager at the time of Scanlon's dismissal.  She was previously the Nurse Manager for the Labor and Delivery Unit; Haviland replaced her there.

Hertkorn testified that among her duties when she held the post of nurse manager was investigating allegations of nurse misconduct.  The procedure for such an investigation was to speak to all the people involved, including the patient, the family physician, the supervising nurse, the staff nurse and the accused nurse.

Hertkorn supervised Scanlon from the late 1980s through 2004.  During that time, Hertkorn never witnessed Scanlon abandon a patient and considered Scanlon a good, kind, efficient nurse.  Of the fifty to sixty nurses that worked in Maternal Child Health, Scanlon was one of five or six who maintained certifications in inpatient obstetrics.

### 9.      Susanne Wacker's Testimony

Wacker was the OB tech working on January 1, 2005 and the person whose complaint was the alleged basis for Scanlon's termination.

Wacker arrived at Jeanes at 10:30 a.m. on January 1, 2005.  She testified she was scheduled to come in at 11:00 a.m. that morning but her normal shift began at 7:00 a.m.  Wacker testified that she had nothing to do with that scheduling change.  When presented with her deposition testimony, in which she stated clearly that she had requested to come in at 11:00 a.m. rather than 7:00 a.m. because it was New Years' Day, Wacker insisted that she had nothing to do with the scheduling change.

After the miscarriage, Scanlon asked Wacker to get a Formalin bucket and forceps to retrieve the fetus and placenta from the toilet.  They placed the fetus in the bucket.  Wacker testified that she believed she and Scanlon made a mistake by putting the fetus in a Formalin bucket.  No one told her she had made a mistake at that time, but Wacker nonetheless believed she had done something wrong because Dr. Airoldi and Dr. Bilyak told her they had wanted to do a study that was precluded by the Formalin.

At a February 2005 hearing regarding Scanlon's termination, Wacker testified: that Scanlon refused to comfort the patient; that Dr. Bilyak had questioned why Scanlon had not started an IV; that Scanlon did not want contact with the fetus; the lab could not perform studies on the fetus because it was placed in Formalin; and Scanlon did not give a report to the second shift nurses.  At a hearing on May 12, 2005, Wacker testified it was against Hospital policy to place a fetus removed from a toilet in a Formalin bucket and that Scanlon took the Formalin bucket out of the room; at her February 8, 2006 deposition Wacker testified that she had taken the bucket out.

Wacker testified that she did not complain to Anne Kane, the nursing supervisor, regarding Scanlon.  Her explanation from an earlier hearing was read into the record:

14

> ". . . the whole day was just a crazy day, and then at the end of the
> day I felt because I thought I would be in trouble because I put the
> placenta in the formadehyede, that I was writing up the incident,
> and I left a message in Casey's [Kathleen Haviland] door, who is
> my boss."

Wacker testified that she wrote a problem identification sheet because she thought she

would get in trouble for putting the fetus and placenta in the Formalin bucket.

Dr. Airoldi oversaw the patient after the miscarriage around 11:00 a.m.  The patient's

physician, Dr. Bilyak, did not arrive at the hospital until around 12:00 p.m.  Between 11:00 a.m.

and 3:00 p.m., Scanlon cared for both the miscarriage patient and woman in active labor across

the hall.  Wacker testified that she was not an expert in the field of nursing and does not have

RN, but claimed that Scanlon did not handle the fetal demise appropriately.

She first testified that Scanlon stayed away from patient's room for an hour after the

miscarriage while Wacker stayed there; the notes taken by Welsh of her conversation with

Wacker shortly after the incidents said Scanlon was gone ten minutes.  Wacker testified that Dr.

Airoldi told Scanlon to call Dr. Bilyak, and that the hour she waited with the patient until Dr.

Bilyak arrived the patient was suffering from heavy bleeding and that no one administered an IV.

According to Wacker, she did not alert anyone about the heavy bleeding because "everyone

knew."  When Dr. Bilyak arrived, Wacker testified that Dr. Bilyak argued with Scanlon as to why

an IV had not been started; Scanlon hadn't thought one necessary.

Wacker consistently changed and qualified her testimony and appeared incredible; her

appearance and demeanor while testifying would also justify a jury's questioning her credibility.

### 10.    Dr. Bilyak's Testimony

Dr. Bilyak was the personal physician of the patient who miscarried.  She testified that

Dr. Airoldi contacted her on January 1, 2005 to inform her that her patient had suffered a miscarriage.  At trial, Dr. Bilyak testified that when she arrived the patient was suffering from heavy bleeding.  At her deposition, Dr. Bilyak reviewed the patient's chart and testified that nothing in the chart indicated heavy bleeding.  She stated that if Dr. Airoldi thought there had been heavy bleeding, he would have stated that on the chart.  Dr. Bilyak was evasive and obstinate when presented with her deposition testimony and would not admit the contradiction.

Dr. Bilyak confirmed that the fetus was eighteen weeks old at the time of the miscarriage and that there was no confusion about that fact.  She testified that Scanlon followed all of her orders following her arrival at the hospital, and Dr. Bilyak made no complaint about Scanlon's performance that day.  The first time she heard it criticized was when she was contacted by Welsh for the investigation.  No one she knew of complained except Wacker.

Dr. Bilyak's understanding was that Wacker complained about having to assist Scanlon in retrieving the fetus from the toilet.  Dr. Bilyak testified that Scanlon did not refuse to start an IV, but that she thought a nurse could start IV without a doctor's orders.  Dr. Bilyak suggested that Dr. Airoldi may have ordered an IV and Scanlon had not complied.

The court had to direct Dr. Bilyak multiple times to speak up and not to mutter, and at the conclusion of her testimony Dr. Bilyak conceded that Scanlon in fact did nothing wrong in treating her patient.

### 11.    Dr. Airoldi's Testimony

Dr. Airoldi was moonlighting at Jeanes on the evening of Dec 31, 2004.  Dr. Airoldi is Board certified in obstetrics and gynecology and attended to the patient who suffered the miscarriage.  Dr. Airoldi admitted the patient with cramping on December 31, 2004 and he

16

decided to keep her overnight.  Because the patient had a cerclage[8] he was afraid she was susceptible to miscarriage.

On the morning of January 1, 2005 Scanlon informed Dr. Airoldi that the patient was throwing up; Dr. Airoldi told Scanlon to administer Vistaril to help with the patient's nausea. Shortly thereafter he was called to the patient's room where he conducted an ultrasound and found her womb empty.

Dr. Airoldi kept Dr. Bilyak apprised of the patient's condition; Dr. Bilyak did not inform Dr. Airoldi that in the case of a miscarriage, she wanted the fetus preserved for a chromosomal study.  Dr. Airoldi testified that Scanlon did not violate hospital policy by placing the fetus in a Formalin bucket.  There was nothing inappropriate about Scanlon putting the fetus and placenta in Formalin and bringing them to another room to inspect them.

Dr. Airoldi did not order an IV after the miscarriage was complete; the patient's cramping and bleeding had stopped within five or ten minutes and he decided that the patient did not need Pitocin.  There was nothing medically severe about the patient's condition at the time he called Dr. Bilyak to come to the hospital.

In Dr. Airoldi's opinion there was no misconduct in dealing with this patient.  He did not recall Dr. Bilyak complaining about Scanlon, and had no problem communicating with Scanlon on any of the over forty occasions he worked with her, although he told Welsh in her interview that Scanlon had been "bitchy" and complained about the miscarriage patient being needy on January 1, 2005.

_____

[8] A cerclage is a suture that reinforces the cervix to increase tissue resistance and prevent miscarriage.

### 12.    Marie Gardner's Testimony

Gardner was a human resources generalist at Jeanes at the time of Scanlon's termination. On Jan 25, 2005 Scanlon came into Jeanes to inquire about the fair hearing process. Gardner informed her the time for appeal had lapsed and she sent Scanlon a letter advising her of that fact.

### 13.    Witness Credibility

Jeanes' case rested primarily on the testimony of Susanne Wacker, the OB tech who filed the complaint of misconduct for which Scanlon was allegedly terminated. The jury could reasonably have found Wacker the least credible of all the witnesses. She answered questions in a transparently evasive manner, was combative with counsel, and appeared to have a shaky recollection of the facts. Her testimony at trial was at odds with both her deposition testimony and hospital records admitted in evidence. Wacker's admission that she filed the complaint against Scanlon to avoid getting in trouble herself for mishandling the fetus undermined the veracity of her testimony.

The jury could have found the testimony offered by Dr. Bilyak was not credible. Dr. Bilyak mumbled, would not look trial counsel in the eye, and changed a number of her answers when pressed. Although Dr. Bilyak was not an employee of Jeanes' hospital, her practice depends on having access to Jeanes' facilities for births and so the jury could reasonably have inferred bias.

The balance of the witnesses offering favorable evidence for Jeanes hospital were all Jeanes administration officials whose actions regarding Scanlon's termination were being called into question. The jury could have inferred bias in their testimony and have found them incredible as a result. Furthermore, the credibility of Frasca, Welsh, and Haviland was severely

18

undermined in view of the cursory investigation of Scanlon's alleged misconduct.

## III.   DISCUSSION

### 1.     Motion for Judgment as a Matter of Law

F.R.C.P. 50(b) allows a party to renew a motion for judgment after a jury has returned a

verdict.  In response to a Rule 50(b) motion, a court may: (1) allow the judgment to stand; (2)

order a new trial; or (3) direct entry of judgment as a matter of law.  A court should only overturn

a jury verdict pursuant to a Rule 50(b) motion if, viewing the evidence in the light most favorable

to the nonmoving party and giving it the advantage of every fair and reasonable inference, there

is insufficient evidence from which a jury reasonably could find liability.  *Fultz v. Dunn*, 165

F.3d 215, 218 (3d Cir. 1998).  In determining whether the evidence is sufficient to sustain

liability, the court may not weigh the evidence, determine the credibility of witnesses, or

substitute its version of the facts for the jury's version.  *Fineman v. Armstrong World Indus., Inc.*,

980 F.2d 171, 190 (3d Cir. 1992).

### a.     Proving a *Prima Facie* case under the ADEA

A plaintiff in an ADEA action must prove by a preponderance of the evidence that age

was a determinative factor in her termination.  *Simpson v. Kay Jewelers*, 142 F.3d 639, 644-45

(1998).  First, a plaintiff must establish a *prima facie* case of discrimination.  *Id.* at 644.  This is

done if she shows that she: (1) is at least 40 years of age; (2) is qualified for the position; (3)

suffered an adverse employment decision; and (4) in the case of a demotion or discharge, was

replaced by a sufficiently younger person to create an inference of age discrimination.  *Chipollini*

*v. Spencer Gifts, Inc.*, 814 F.2d 893, 897 (3d Cir. 1987).

Defendants argue that Scanlon did not satisfy the fourth prong – that is, that she was

replaced by a sufficiently younger person to create an inference of age discrimination.

Defendants' contention is without merit. Scanlon introduced evidence from which the jury could

reasonably conclude that Scanlon was replaced by Ms. Coskery, a sufficiently younger person.

The jury could have found that Scanlon established a *prima facie* case.

Defendants also contend that Scanlon necessarily must have shown that similarly situated

persons were treated more favorably at Jeanes in order to prove her case. This argument is

without merit.

### b.      Age as a Determinative Factor

Upon plaintiff's showing a *prima facie* case, the burden in an ADEA action shifts to the

employer to produce evidence of a legitimate nondiscriminatory reason for the adverse decision;

the plaintiff must then demonstrate that the employer's articulated reason was not the actual

reason, but a pretext for discrimination. *Simpson*, 142 F.3d at 644. The plaintiff must ultimately

point to evidence "with sufficient probative force" that the jury could conclude by a

preponderance of the evidence that age was a motivating or determinative factor in the

employment decision. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1111 (3d Cir. 1997).

Defendants contend that no reasonable jury could have concluded that Scanlon's age was

a determinative factor in her termination and that Scanlon did not meet her burden of providing

sufficient evidence that Jeanes' proffered reasons for terminating her were pretextual. Defendant

makes three arguments: (1) Scanlon failed to introduce evidence of age animus; (2) she did not

offer evidence to prove that proffered reason was a cover-up for intentional discrimination; and

(3) a jury is not entitled to infer discriminatory intent from evidence of a *prima facie* case and

disbelief of proffered reason.

Defendants' first two arguments are without merit.  Scanlon need not introduce direct evidence of age animus; establishment of a *prima facie* case together with the jury's reasonable inference that Jeanes' witnesses were lying would allow the jury to conclude reasonably both that Jeanes' proffered reason was pretextual and that age animus was a determinative factor in Scanlon's termination.  Many cases of age discrimination contain no smoking-gun evidence pointing to age animus as the determinative factor in an employee's termination.  The Supreme Court held in *Reeves v. Sanderson*:

> "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination.  Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.  Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive . . . .  Proving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination . . . .  In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.  Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.  Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision."

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (U.S. 2000).  Scanlon testified that she was terminated as a result of her age and the jury could have reasonably concluded that her explanation was more likely if it believed that Jeanes' witnesses were not telling the truth.

Defendants sole citation of a case binding on this court is *Watson v. SEPTA*, 207 F.3d 207

21

(3d Cir. 2000), holding an employer may take adverse employment action if it believes sincerely that an employee has committed misconduct, even if the employee did not actually do so, without violating the ADEA.  *Watson* is inapplicable.  The jury here did not find that Jeanes made a good faith mistake in firing Scanlon for misconduct she did not commit.  The jury disbelieved Jeanes' explanation that it sincerely believed Scanlon had committed misconduct and therefore could reasonably have found that Jeanes fired Scanlon as a result of her age.  *See Reeves, supra*.

## 2.       Motion for a New Trial

F.R.C.P. 59(a) permits a party to seek a new trial following a judgment "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States."  F.R.C.P. 59(a).  A new trial is appropriate only when the verdict is contrary to the great weight of the evidence or errors at trial result in a verdict inconsistent with substantial justice.  *Roebuck v. Drexel University*, 852 F.2d 715, 735-36 (3d Cir. 1988). A court should grant a new trial because a verdict is against the weight of the evidence if permitting the verdict to stand would result in a miscarriage of justice.  *Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir. 1993).  Defendants contend here that: (a) the verdict was against the weight of the evidence; (b) the court committed legal errors in its instructions; (c) plaintiff's counsel's closing argument was improper; and (d) the court's evidentiary rulings were erroneous.

### a.       Verdict Against the Weight of the Evidence

Defendants argue that a new trial is appropriate because the jury's verdict was against the great weight of the evidence.  The jury's verdict was reasonable in light of the evidence presented and no miscarriage of justice will result without a new trial.

22

**b.      Legal Errors in Instructions**

Defendants contend that three instructions given to the jury were errors as a matter of

law: (i) the adverse jury instruction; (ii) the *Hazen* instruction; and (iii) the determinative factor

instruction.  Defendants' arguments are without merit.

**i.      Adverse Jury Instruction**

Defendants argue that the adverse jury instruction with regard to missing witnesses was

an error as a matter of law.  Defendants failed to preserve their objection to the instruction on the

record, so the objection is reviewed for plain error.

In closing argument, defense counsel stated that:

> "If Coskery and Hartzell had made a threat that they would leave
> Jeanes Hospital unless moved to day shift and it had to be done
> now and it had to be done at the expense of some other nurse, well,
> they would have testified to that.  They would have been
> subpoenaed like the other people that they paraded in as part of
> their [plaintiff's] case in chief, but we didn't hear from Coskery or
> Hartzell, and I would submit we didn't hear from them because it
> simply didn't happen."

Plaintiff's counsel, in rebuttal, argued: "So why didn't defendant call Ms. Coskery and

Ms. Hartzell to come in here and say we didn't replace Ms. Scanlon?  Why didn't they do that?

After all, it was their employee."

The court gave the following instruction:

> "Now, if a party fails to call a witness who presents knowledge
> about facts in issue who is reasonably available to him, her, or it,
> and not equally available to the other party, then you could, if you
> wish, infer that the testimony of that witness would be unfavorable
> to the party who could have called him and did not."

Defense counsel raised the issue of the witnesses' absence in closing, and plaintiff's

counsel responded in rebuttal.  There was no evidence of record that Coskery or Hartzell

remained employees of Jeanes at the time of trial, and so plaintiff's counsel's remarks were

unwarranted.  The court's instruction accurately stated that if the absent witnesses were

reasonably available to one party and not to the other, the jury could draw an adverse inference.

There was no plain error.

### ii.      Hazen Instruction

Defendants next argue that the court's *Hazen* instruction was erroneous.  Specifically,

defendants contend that plaintiff's counsel improperly argued that Jeanes terminated Scanlon's

employment to save money and that court did not adequately address this with its *Hazen*

instruction.  The court instructed the jury as follows:

> "[T]he other thing that I would like to make clear is the question
> about Jeanes Hospital terminating her to prevent increased pension
> payments or to save them money.  And pension benefits are
> distinct from age discrimination, just as a salaries are distinct from
> age discrimination because you can have younger workers who
> have worked much longer than an older worker and this action is
> not about not giving her a pension.  But if those factors enter into
> your – if you think that the evidence has shown that age was a
> determinative factor, you could consider those matters only with
> regard to whether it was her age; otherwise, they're not proper
> because this is an age discrimination case and there are other laws
> about pensions."

During deliberations, the jury asked the court, "Can age discrimination be inferred from

the belief that the termination was an economic decision (high pay scale, pension, et cetera), and

that an elder employee would be expected to be more highly compensated?"  In response, the

court stated:

> "The brief – the general answer as you phrased the question is, no,

24

you can't infer it from a belief that the termination was an economic decision because you have to find that it was because of her age; that it was age discrimination.  The Supreme Court has said that there is no perfect correlation between age and compensation and – and to the extent that pensions depend on years of experience between an pension amount and age – I'm talking about liability now because you clearly can take the pension into account on damages.  I want to make that clear.

"However, you can take her personal circumstances, what you know about her salary, and decide if it was her age, if they knew her age, that from the fact – that's one of the facts you could consider in deciding whether you can draw an inference of age discrimination.  Because I think counsel would both admit that there's no direct evidence of age discrimination, and counsel for plaintiff is relying on the inference of age discrimination and the fact that the proffered reason by the employer was pretextual.  That is, it wasn't real, it was just a coverup.  I hope that answers your question.  You may return to continue your deliberations."

The court's instruction was an accurate statement of the law.  *Hazen* states:

"[A]n employee's age is analytically distinct from his years of service. An employee who is younger than 40, and therefore outside the class of older workers as defined by the ADEA may have worked for a particular employer his entire career, while an older worker may have been newly hired.  Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily age based. . . . Pension status may be a proxy for age, not in the sense that the ADEA makes the two factors equivalent, but in the sense that the employer may suppose a correlation between the two factors and act accordingly.  Nor do we rule out the possibility of dual liability under ERISA and the ADEA where the decision to fire the employee was motivated both by the employee's age and by his pension status. . . . Our holding is simply that an employer does not violate the ADEA just by interfering with an older employee's pension benefits that would have vested by virtue of the employee's years of service."

*Hazen Paper Co. v. Biggins*, 507 U.S. 604, 612-13 (U.S. 1993).  *Hazen* stands not for the

proposition, as defendants appear to contend, that a jury may not consider an employee's pension

or years of service as circumstantial evidence of age discrimination, but for the proposition that a

jury may not equate years of service or vesting of a pension with age discrimination.

The court's instruction specifically directed the jury that it could not infer age

discrimination from Scanlon's high pay rate.  It instructed the jury that all of Scanlon's personal

circumstances could contribute to circumstantial evidence of age discrimination, and a jury may

find that an employer supposes "a correlation between the two factors." *Id.*  Having stated the

proper formulation of the law in the positive, the court was under no obligation to restate the law

in the negative and instruct affirmatively that terminating an employee to save salary is not a

violation of the ADEA.  The instruction as given accurately stated the law.

### iii.      Determinative Factor Instructions

Defendants next argue that the court's determinative factor jury instructions were

erroneous as a matter of law.  The court instructed as follows:

> "A determinative factor, as I explained to you, means something
> that was significant in the decision, but it doesn't have to be the
> only reason or the only factor."

After defendants objected to this charge, the court explained:

> "Counsel are concerned that I haven't been clear enough about the
> plaintiff's obligation to prove that age was a determinative factor.
> Determinative factor means that if not for the plaintiff's age, the
> termination would not have occurred.  However, it doesn't have to
> be the only reason.  It just has to be a reason.  But it has to be a
> determinative reason."

Defendants seem to contend that because the court did not adhere precisely to the Third

Circuit's model instruction, it was error *per se*.  The court accurately stated the law in its

26

instructions

### c.      Closing by Plaintiff's Counsel

Defendants' counsel objected three times during plaintiff's counsel's closing: (1) when

plaintiff's counsel implied that defendant's counsel deliberately withheld a statement from a

witness prior to testifying; (2) reference a letter written by Dr. Isdaner which had not been

admitted in evidence; and (3) plaintiff's counsel's statement that, "it's defendant's burden to

prove they terminated the employee for a legitimate reason or they – or that their reason is

legitimate."  Defendant has preserved its objections to these three statements only.

Prejudice from improper statements sufficient to warrant a new trial occurs when the

improper assertions have made it "reasonably probable" that the verdict was influenced by

prejudicial statements.  *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 207 (3d Cir. 1992)

The court sustained the first objection and instructed the jury to ignore the remark.  There

is no reasonable probability that the verdict was influenced by this statement.  The reference to

Dr. Isdaner's letter was not to the content of the letter, but simply that one was written, which

was testified to without objection.  It was not improper for counsel to refer to Dr. Isdaner's

testimony.  Plaintiff's counsel's erroneous statement of the legal burdens, corrected by plaintiff's

counsel himself only moments later, was cured conclusively by the court's closing instructions

regarding the ADEA law.  There is no reasonable probability that counsel's remarks improperly

influenced the verdict.

### d.      Evidentiary Rulings

Defendants contend that the court's rulings excluding Wacker's complaint and

Welsh's investigation notes were erroneous.  Wacker's complaint and Welsh's notes were

hearsay and properly excluded from evidence.  Defendants' argument that they were not offered

for the truth of the matters asserted – that is, to prove that Scanlon committed misconduct – is

unconvincing.  Defendants' claim was that Scanlon was terminated for proper reasons and the

notes and complaint were both primarily probative of those reasons.

Neither the complaint nor the notes qualify as business records because they were not

kept in the ordinary course of business.  There was no error in excluding Wacker's complaint and

Welsh's notes.

## IV.    CONCLUSION

Because the jury reasonably could have found that a preponderance of the evidence

showed that Scanlon was terminated as a result of her age, the verdict was in accord with the

weight of the evidence.  There was no non-harmless legal error.  Defendants' post-trial motions

for judgment as a matter of law and a new trial will be denied.